JUDGE LINDSAY
delivered the opinion oe the court.
On the 16th of August, 1864, B. F. Ray deposited with the Bank of Kentucky, at its branch in Bowling Green, a package containing sixteen thousand and fifteen dollars in United States legal-tender notes. On the 24th of the same month he deposited with the same bank and at its said branch a bag containing five thousand one hundred and sixty-six dollars in gold coin. They were special deposits, for the keeping of which the bank was to receive no compensation. The cashier issued to Ray certificates describing the deposits, and reciting that they were to be held at his risk and to be delivered to him upon his receipt entered upon the special deposit-book of the bank.
In January, 1866, the Bank of Kentucky withdrew its branch from Bowling Green and sold its banking-house and vaults, with the greater portion of its assets, to a new banking corporation styled “The Bank of Bowling Green.” The persons, or at least a majority of those who had acted as *347 directors of the branch of the Bank of'Kentucky at Bowling Green were made directors of the new bank. The old cashier, Thomas C. Calvert, was made its cashier, and, except the changes necessarily incident to the change of proprietors, the business was carried on by the new organization exactly as it had been carried on by the old. In the sale by the Bank of Kentucky to the Bank of Bowling Green, and in. the arrangements under which the one became the successor of the other, the special deposits on hand seem to have been entirely overlooked. Tliey were, however, left in the vault in which they had always been kept, and the special-deposit book in which they were entered was left in the custody of the new bank. The proof tends to show that Ray was aware of the fact that his package of legal-tender notes and bag of gold coin were left in charge of the Bank of Bowling Green, and it is claimed that he ratified the change and accepted the last-named bank as his bailee.
Ray died in October, 1870. Shortly thereafter appellants qualified as the administrators of his estate. They demanded the deposits evidenced by the two certificates dated respectively the 16th and 24th of August, 1864; and the bank failing to deliver them, this action was instituted to recover their value.
The bank defended, claiming exoneration from liability upon two general grounds:
First — It avers that the deposits when received were placed in its vaults where its own moneys and valuables were kept; that the same care and diligence were exercised in the preservation of these deposits as it exercised in preserving its own property of like character and value, and that this care and diligence was such as ordinarily prudent persons generally exercise under like circumstances; and further, that said deposits were preserved until January, 1866; that in this month it withdrew its branch from Bowling Green, and left them in the custody and control of its successor, the Bank of Bowling *348 Green, and that Ray, with full knowledge of all the facts, ratified its action in the premises, and accepted the last-named bank as his bailee, and from that time forward looked to it alone for the execution of the contracts of bailment.
Second — That if the Bank of Bowling Green did not after January, 1866, hold these deposits in its own right, then it héld them as appellee’s agent, with the knowledge and approval of the depositor; and that it exercised the same care and diligence in their preservation as had theretofore been exercised by the appellee; and that they were lost by being fraudulently and feloniously abstracted from the vaults of said last-named bank by Thomas C. Calvert, its cashier, without the assent or knowledge of its president or directors, or any of them; and that up to and after this fraudulent and felonious act said cashier bore' the reputation of a faithful and honest bank-officer, and that the bank had no reason up to such time to suspect him of dishonest practices.
We do not deem it necessary to review critically the evidence. It is sufficient to say that there was evidence before the jury tending to support both defenses. We will therefore proceed at once to consider the ease in its legal aspects.
Instruction No. 1 given by the court of its own motion is substantially a restatement of the principles embodied in instructions Nos. 1 and 7 given at appellee’s instance. Said instruction is in these words: “If the jury believe from the evidence that (by) the charter, by-laws, and usage of defendant Thos. C. Calvert, as defendant’s cashier at its office or branch at Bowling Green, had the right to receive and did receive of plaintiffs’ intestate, Dr. Ray, the United States legal-tender notes and gold, as set forth in the certificates of deposits or receipts exhibited by plaintiffs in their petition, and gave said receipts to said Ray for the same, and that afterward the defendant, without the knowlege or consent of said Ray, did transfer or cause to be transferred the care and custody of said *349 legal-tender notes and gold to the Bank of Bowling Green or its cashier, Thomas C. Calvert, then from the time of such transfer the notes and gold so transferred were at the risk of defendant. If, however, the jury should believe from the evidence that after such transfer to the Bank of Bowling Green or to said Calvert, the cashier thereof, while said gold and notes were in its custody and care or in that of its cashier, the said Bay had notice or was informed of such transfer of the notes and gold, and after such notice or information assented thereto, or failed to object and within a reasonable time to notify defendant or its agent of such objection, if he did so object to said transfer, then after such assent or failure to object and give such notice if he did object, within such reasonable time, the risk of defendant by reason of the transfer to the Bank of Bowling Green or to said Calvert was at an end, and. devolved upon said Bay. What was reasonable time within which it was the duty of Bay to notify the defendant of his objection to such transfer after notice thereof, if he received such notice or information and did so object, is a question for the' jury to determine in view of the facts of the case.”
We do not see that the theory of this instruction, upon the idea that the Bank of Kentucky when it discontinued its branch at Bowling Green transferred the deposits to the Bank of Bowling Green as its successor, and that the transfer was assented to by Bay with full knowledge of the facts, is objectionable. Bay lived in the adjoining county to Warren, in which Bowling Green is situated. The inference is reasonable and legitimate that he expected his deposits to be kept at Bowling Green. But the Bank of Kentucky was not bound to keep a branch at that place, and when it withdrew its branch the deposits had to be removed to Louisville or left with the Bank of Bowling Green, either as the successor or agent of the Bank of Kentucky,.or returned to the depositors; *350 hence the act of the defendant in so leaving them did not ne.eessarily imply a conversion.-
It was the duty of the appellee to notify its depositors of its action; yet notwithstanding it may have failed to discharge that duty, if Bay otherwise acquired notice or information and then voluntarily ratified or acquiesced in the arrangement, he must be held to have consented either that the Bank of Bowling Green should hold his deposits on its own account or as the agent of his bailee, the Bank of Kentucky. If by such ratification or acquiescence he consented that the Bank of Bowling' Green should hold the deposits on its own account, then from that time forward it should be treated- as Bay’s bailee, and the appellee can not be held liable for the loss of the deposits.
But the instruction is objectionable, first, because it assumes it to be an established fact that the Bank of Bowling Green did undertake to hold, preserve, and account for the special deposits on its own account. To say the least, the evidence leaves this a questionable proposition. Second, because it confounds the Bank of Bowling Green with its cashier, Thomas C. Calvert. The court repeatedly speaks of the transfer of the deposits to the bank or to Calyert. No such transfer-is averred in the pleadings, and there is no proof that the Bank of Kentucky made any arrangements with Calvert concerning these or any other deposits. The connection in which Calvert and the bank are used tended to impress the jury with the idea that the contract of deposit was entered into or the transfer to the Bank of Bowling Green ratified, if ever ratified, upon the faith of his being continued in office as cashier, and that the depositor reposed in him special trust and confidence. The contracts were with the - banks and not with Calvert, and there is no more reason why special prominence shall be given to the employment-of Calvert in this connection than to the employment or agency of any other officer. The banks may *351 have had confidence in Calvert’s honesty, and Ray no doubt had; but as his contract was with one or the other of the banks, no stress should be put upon the fact-that Calvert as the cashier, first of one and then of the other, was charged with the duties especially pertaining to the keeping and preservation of the lost deposits. The same objection applies to instruction No. 4 given on the motion of the court.
Appellants’ counsel asked the court to instruct as follows. “If the jury believe from the evidence the money claimed in the petition was deposited by Dr. Ray with defendant for safe keeping, and that the money was fraudulently taken and converted by the person with whom defendant kept it, they should find for plaintiff, unless they believe from the evidence that prior to such taking or conversion Dr. Ray had released the defendant from the contract to keep the money.”
The court refused so to instruct; and on the contrary, after propferly defining the degree of diligence and care necessary to be exercised by bailees for accommodation, instructed that the bank “is not chargeable or responsible for the theft or criminal appropriation of the property by its servants or employees,” and that if the jury believed “from the evidence that the defendant’s servant, agent, or employee stole or fraudulently, for his own purposes or use, abstracted the deposits from the keeping of defendant, the law is for the defendant upon the contracts here relied on.”
The instruction asked by appellants was properly refused. It wholly fails to recognize the fact that the Bank of Bowling Green may have held the deposits as the bailee of Ray and not as the agent of the Bank of Kentucky. Further than this, it makes the bank liable if the deposits were stolen by the person to whose custody the bank intrusted them, notwithstanding it may have exercised the- greatest possible care and diligence to preserve them.
Before considering at length the legal questions raised by *352 the instruction asked by appellants and the one given by the court we will observe that the latter, in any view of the law, is incorrect. It treats the felonious or fraudulent act of the servant or employee of the bank as conclusive evidence that the bank had not been guilty of such want of care and diligence as to render it liable.
In all the cases and in all the elementary works it is laid down as essential to the defense of an action of this character that the gratuitous bailee had no reasonable ground for suspecting the honesty of the servant or employee alleged to have committed the felonious or fraudulent taking; and as evidence touching the manner in which Calvert had discharged his duties as cashier of the Bank of Bowling Green, and as to the knowledge of one at least of its directors of certain of his irregularities in failing to respond to letters of inquiry as to moneys collécted by the bank, and in drawing checks upon other banks at which the Bank of Bowling Green had no deposits and with which it had made no arrangement to have such checks honored, had been allowed to go to the jury, the question as to whether the bank had or not such ground for suspicion as should have put it upon inquiry as to the conduct and honesty of its cashier ought not to have been taken from their consideration, as was in effect done by giving said instruction without the qualification indicated.
A gratuitous bailment does not imply an undertaking by the bailee to use more than ordinary diligence and care in preserving the property intrusted to his custody. He is not responsible for its loss unless occasioned by fraud or gross negligence upon his part; and the presumption of fraud or gross negligence is in general rebutted by the fact that he observed the same care and diligence in preserving the deposits that he did in the preservation of his own property of like character and value. This test, however, is not conclusive, as he may have been grossly negligent as to his own property.
*353 Appellants insist that if the Bank of Bowling Green be treated as the agent of the Bank of Kentucky, then want of proper diligence by the agent, resulting in the loss of the deposits, renders the Bank of Kentucky liable; and in this proposition we concur. But they insist further that a bank holding special deposits ought to be accountable for their loss as well when occasioned by the fraud or felony of its cashier as when by his gross negligence. That there may be cases in which corporations can and ought to be held liable for the felonious or fraudulent acts of their servants or agents we do not doubt; but in such cases, as the criminal or fraudulent act of one person is so far imputed to another as to make him answerable therefor in damages, it should appear that the agent or servant at the time of the commission of the felony or fraud was acting within the scope of his employment.,' and that the misconduct naturally connects itself with the service or duty being performed for or in the name of the master or employer. ‘
As in the case of Sherley, &c. v. Billings (8 Bush, 147), where the clerk of the steam-packet feloniously put out the eye of a passenger while engaged in the discharge of his duties as clerk; or in the case of Swift v. Winterbotham (8 Queen’s Bench Reports, 244), where the general manager, when acting for and in the name of the banking association, and in the discharge of a duty imposed on him by the character of his agency or employment, fraudulently misrepresented the solvency of a person seeking credit of another; of the same character are the cases of Berwick v. The English Joint Stock Bank (2 Exchequer Reports, 259) and Burns v. Poulman (8 Common Law Reports, 563).
There is a perceptible distinction between this class of cases and those of accommodation bailments, such as banking institutions receiving and agreeing to hold special deposits until it shall suit the convenience of the bailor to withdraw *354 them. Parties to this character of contracts do not expect that the depositary shall do more than place the deposits in the vault or strong-box in which its own moneys and valuables are kept, and permit them to remain until called for by the depositor. While the bank must exercise- good faith in the selection of its agents and servants, and neither employ nor retain in its employment any person having access to the deposits whose integrity it has reason to question, still, as the depositor knows that the business of the corporation can be transacted in no other way than through the instru-. mentality of agents and servants, it is not unreasonable to hold- that as the corporation risks their honesty as to such of its property as is intrusted to their keeping^ the bailor, who pays no compensation for the service he receives, takes the same risk as to the property deposited. Such diligence and care in the preservation of the deposits as a reasonably prudent person generally exercises in the care and preservation of his own property of like nature, and good faith in the selection of the agents to whom they are intrusted, is as much as a bailor for whose accommodation deposits are received and held can conscientiously require.
Unlike contracts of mandate, which generally imply labor and service, contracts of deposit, and especially such as those under consideration, are in their nature merely passive. If labor or service is to be performed, it is merely incidental, and is not the principal object of the contracting parties. In this case the bank was required to do nothing more than-to permit the deposits to remain in its vault until called for by the depositor. Its cashier was charged with no other duty. It was not expected that he should for any purpose open the package or bag. As to them his whole duty consisted in using proper care and diligence in closing and fastening securely the doors of the vault and banking-house when business hours were over.
*355 If he turned aside from the discharge of this negative or passive duty, and assumed to act for himself clearly outside of the scope of his employment, and opened the package and bag and appropriated the contents to his own use, then, unless the bank prior to such action had reasonable ground to suspect his integrity, it can not be made to answer for his said fraud or felony. We have reached this conclusion after a patient and careful examination of all the authorities. It is in harmony with principle, and is supported by an almost, if not an unbroken line of precedents. (Foster, &c. v. The Essex Bank, 17 Mass. 479; Giblin, ex’r v. McMullen, 2 Privy Council, 317; Scott v. National Bank of Chester Valley, Supreme Court of Pennsylvania, Feb. 16, 1864; Story on Bailments, sec. 88; Morse on Banking, p. 82; United Society of Shakers v. Underwood, 9 Bush, 609.)
The case last cited (of the Shakers v. Underwood) is in full accord with the principles herein announced. That case was before this court upon a general demurrer to the petition, and while we adhered to the general doctrines of the Essex Bank case, even to the extent that a bank is not required to investigate its own accounts for the benefit of its special depositors, still we regarded the petition as presenting a cause of action upon the ground that if the officers of the bank sold the special deposits, and used the proceeds in the business of and for the uses and purposes of the bank, and the proceeds were so used through the active agency of the directors, then they are personally liable by reason of their participation in the tort, and they can not escape liability because they were not aware that they were wrongfully using the proceeds of a depositor’s property, when this want of information was the result of their willful inattention to, and gross negligence in, the discharge of their official duties.
In the case at bar it is not pretended that the bank received any benefit whatever from the misappropriations of Ray’s de *356 posits, nor that the fraudulent or felonious acts of the cashier were connived at or assented to by its directors, or any of them. It does not therefore come within the principle of the case of the Shakers.
In conclusion, unless Ray, directly or by implication, assented to or ratified the transfer of his deposits to the custody of the Bank of Bowling Greeny and unless such assent or ratification was given before they were lost or stolen, then the Bank of Kentucky must bear the loss.
If the deposits were transferred to the Bank of Bowling Green to be held by it as the agent of the Bank of Kentucky, and Ray assented to or ratified the transfer to this extent, but still retained the certificates of deposit, and also looked to the Bank of Kentucky as his bailor, and he so assented to or ratified the transfer before the deposits were lost or stolen, then the Bank of Kentucky is not liable for their loss, unless it was occasioned by the gross negligence of its said agent. And if the deposits were stolen or fraudulently misappropriated by the cashier of the Bank of Bowling Green, then the Bank of Kentucky is not liable, unless prior to the time they were so stolen or misappropriated the directors of the Bank of Bowling Green, or some of them, had reasonable ground to suspect-the integrity of its said cashier.
If the deposits were left with the Bank of Bowling Green to be held in its own right, and Ray directly or by implication consented that it should so hold them, then from the time such consent was given (if the deposits had not already been lost or stolen) the Bank of Kentucky was released from all further liability, and can not be held responsible for their value.
For the reasons given the judgment is reversed, and the cause remanded for a new trial and for further proceedings upon principles consistent with this opinion.