THE STATE ex rel. and to the use of CARRIE V. C. WANN et al., Appellant, v. JOSEPH DICKSON, Jr., et al.

### Division Two, June 16, 1908.

1. **PREMATURE SUIT: On Administrator's Bond: Debts: Negligible Amount.** The distributees of an estate, after the debts are all paid, have their right of action on the administrator's bond, whether final judgment or order of distribution has been made or not. And where the estate is large, a small debt may be considered as a negligible quantity and no obstacle to the suit. And so where all the allowances except one for $10.33, which had been overlooked, had been paid, and, after the commencement of the suit but before the filing of the first amended petition, that had been paid by one of the distributees, who in that petition waived all claim for reimbursement therefor, the suit on the administrator's bond is not premature.

2. **ADMINISTRATION: Sale of Personalty: Order in Vacation.** Under the statute, the probate court may in vacation order the administrator "to sell the personal estate of deceased, or any part thereof, at private sale, for reimbursement or other purposes."

3. ———: ———: **Duty of Administrator to Estate.** An administrator occupies the position of a trustee to those who are interested in the estate, and is liable for failure to exercise that due care and skill which prudent men would exercise in the management of their own affairs; and the method of performing this trust and the duties arising out of it are regulated by the statutes.

4. ———: **Sale of Stock: Acquiescence of Distributees.** The evidence in this case is set out at length, and held beyond controversy to establish the fact that the husband of one distributee and the step-father of another had authority to represent them in urging the administrator to sell stock belonging to the estate, at a named price, and that he did act for and represent them in everything he did in reference to its sale.

5. ———: ———: ———: **Without Order of Court: Devastavit.** A sale of personal property by the administrator, upon the direction and at the request of adult distributees, or one who had authority to represent them, without an order from the probate court, bars them from any right to recover on the administrator's bond for any mismanagement of the estate resulting from such sale. He has a right to rely upon their approval of the sale, and as to them it makes no difference whether he got an order of the probate court to sell or not.

6. ———: ———: **No Acquiescence of Distributees: Minor: No Order of Court.** But the sale of stock by the administrator, without an order of court, does not bind an adult distributee who knew that a sale was pending, but did not authorize it or in any wise acquiesce in it except by silence; nor does it bar a distributee who at the time was a minor. As to them, the debts being paid, they can recover from the administrator or his bondsmen for any mismanagement of the estate. And where he signed an agreement to sell stock at $500 per share, which was twice as much as it had ever before sold for, but which before he delivered it, owing to the fact that two rival trust companies were endeavoring to get a majority of the stock, rose to $600, $700, and $750 per share, and there is evidence that he knew that fact, it devolves upon the administrator or his bondsmen to show that no loss resulted to such distributees by his unauthorized act of selling without an order of court, although he was at the time under the impression that no order to sell could be obtained in vacation.

7. ———: ———: ———: **No Damage.** Notwithstanding the administrator sold the personal estate without an order of court, and therefore sold without authority, yet if the minor or non-acquiescing adult distributees suffered no damage from such sale, they cannot complain.

8. ———: ———: **Devastavit: Question for Jury.** In a *devastavit* suit by the distributees upon the administrator's bond for the sale by him of stock without an order of court, they concede the title to the property passed, and seek damages for the difference in price which they lost by the sale. And he is liable to minor distributees, and to adult distributees who did not authorize the sale or acquiesce therein, for any loss they have suffered by his unauthorized and imprudent sale. And whether he acted as a prudent man would have done under similar circumstances in the management of his own estate, is a question for the jury.

9. ———: ———: ———: ———: **Measure of Damages: Evidence: Secret Sales.** But newspaper articles as to the value of the stock sold are inadmissible in establishing the loss. And testimony of what other stockholders received for their stock, at private sales, made under an injunction and promise of secrecy, is incompetent to fix the liability of the administrator. The true or market value cannot be established by such unusual transactions.

10. ———: ———: ———: ———: ———: **Subsequent Prices.** Nor is evidence that other stock of the same kind subsequently sold for a very much higher price than he obtained, competent evidence to establish the distributees' loss from the sale of the

estate stock. The administrator's liability for a greater sum than he obtained must be determined by the knowledge he had before he delivered the stock of such increased price, or by such knowledge as he could have obtained by that care and prudence that a prudent man would have exercised under similar conditions.

11. ———: ———: **Good Faith.** The law casts upon the administrator the risk of loss to the estate in selling stock without an order of court, and his good faith in making the sale alone will not exonerate him from any consequent damages from a lack of prudence and judgment in selling it.

12. ———: ———: ———: **Acquiescence of Others: Evidence of Prudence.** Notwithstanding the conduct of some of the adult distributees in urging the administrator to sell estate stock at a stipulated price, he is not exonerated from any loss to the other minor or non-acquiescing distributees resulting from the sale, but the judgment and conduct of those who urged the sale may well be taken into account in passing upon his skill and prudence in making the sale.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neill Ryan,* Judge.

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.

*John A. Gilliam* and *Luther Ely Smith* for appellant.

(1) On all the evidence before the court, the case should have been submitted to the jury. State to use v. Berning, 74 Mo. 96; Hamilton v. Berry, 74 Mo. 176; McDermott v. Railroad, 73 Mo. 516; State ex rel. v. Matson, 44 Mo. 305; State ex rel. v. Thornton, 56 Mo. 325; Stagg v. Greene, 47 Mo. 500; Chandler v. Stevenson, 68 Mo. 450; Scarritt v. Jackson County, 89 Mo. App. 595; Hankinson v. Lombard, 25 Ill. 572; Montgomery v. Railroad, 181 Mo. 504; Ladd v. Williams, 104 Mo. App. 398; Andrew v. Pritchet, 66 N. Car. 387; Baylis v. Ins. Co., 113 U. S. 316. (2) A sale of personal property by an administrator without an order of the probate court, is at the administrator's own risk, and he is bound to respond to the

beneficiaries of the estate for the difference between the price which he actually obtained and that which he should have obtained. R. S. 1899, sec. 117; Schouler on Executors (3 Ed.), sec. 346; Smith, Prob. Law (1868), p. 111; Powell v. Powell, 23 Mo. App. 372; Garesche v. Priest, 9 Mo. App. 270, 78 Mo. 126; In re Gorman's Estate, 50 Mo. 179; Stagg v. Green, 47 Mo. 502; Stagg v. Linnenfelser, 59 Mo. 341; Chandler v. Stevenson, 68 Mo. 453; State to use v. Berning, 74 Mo. 96; Boeger v. Langenburg, 42 Mo. App. 13; Richardson v. Palmer, 24 Mo. App. 480; Devore v. Pitman, 3 Mo. 182; Cowgill v. Linville, 20 Mo. App. 138; Stephens v. Mayor of Boonville, 34 Mo. 325. (a) The administrator himself having admitted by his letters in evidence on the trial that he might have obtained $600 per share for the stock, and the evidence further tending to show that he might have obtained as high as $1,500 per share for the stock, it was manifestly a question for the jury to determine whether or not the administrator could have obtained more than $500 per share for the stock, and if so, how much more than that figure he could have obtained. Newell v. West, 13 Blatch. 114; Wynns v. Alexander, 2 Dev. & Bat. Eq. 58; Cannon v. Jenkins, 1 Dev. Eq. 427; Wells v. Mills, 22 Tex. 302; Morton v. Johnston, 124 Mich. 563; Lappin v. Munford, 14 Kan. 9; Weyer v. Bank, 57 Ind. 198; Railroad v. Robbins, 128 Ind. 499; Ventress v. Smith, 10 Peters 175; Lay v. Lawson, 23 Ala. 390; Ilkenheimer v. Chapman, 32 Ala. 683; Winningham v. Holloway, 51 Ark. 388; In re Radovich, 74 Cal. 539; Briscoe v. Thompson, 1 Freeman's Ch. 159; Furn. Co. v. Stiles, 60 Miss. 849; Burnap v. Dennis, 4 Ill. 482; Williams v. Perrin, 73 Ind. 57; De La Montaigne v. Ins. Co., 42 Cal. 290; Henning v. Conner, 2 Bibb 188. (b) The mere fact that the administrator had made an agreement to deliver the stock at $500 per share, is no ground for relieving him from responsibility for his failure

to secure the highest price obtainable for the stock. Such an agreement did not bind the estate or these relators. His personal punctilio is no ground for affirmance of the sale, nor is the fact that he exercised the utmost good faith, or that he took the advice of counsel, any defense. Desloge v. Tucker, 196 Mo. 587; Garesche v. Priest, 9 Mo. App. 270, affirmed 78 Mo. 126; Poullain v. Brown, 82 Ga. 425; Butler v. Butler, 10 R. I. 501; Schouler on Executors (3 Ed.), sec. 341, p. 429; sec. 346, p. 434; Weil v. Jones, 70 Mo. 500; State to use v. Scholl, 47 Mo. 84; State to use v. Berning, 74 Mo. 87; Rittenhouse v. Amerman, 64 Mo. 197; Stagg v. Linnenfelser, 59 Mo. 342. (3) Acquiescence implies and is founded upon knowledge. Acquiescence cannot be claimed unless the party against whom it is set up is aware of his rights. A person cannot acquiesce in what he is ignorant of, nor can he be bound by acquiescence unless fully apprised as to his rights, and all the material facts and circumstances of the case. (a) The evidence was not sufficient to establish acquiescence on the part of any of the relators in the administrator's acts. No one had informed any of these relators of their legal rights. Garesche v. Investment Co., 146 Mo. 436; St. Louis Safe Deposit & Sav. Bank v. Kennett Estate, 101 Mo. App. 397. (b) As a matter of law, there can be no ratification of an administrator's acts as far as a minor beneficiary is concerned. The court was bound, in any event, to submit the case to the jury as far as the relator Van Court Warren, an infant, was concerned. (c) Even if the evidence is regarded as tending to show a ratification of the sale by the adult relators, the question of ratification was one of fact which the court, under appropriate instructions, should have submitted to the jury. (d) The right to repudiate an unauthorized act can be lost only by an affirmative act, or by unreasonable delay after opportunity to act with free-

dom and with full knowledge of the material facts, and the burden is on the party asserting ratification to show knowledge on the part of the principal that the unauthorized act had been done for him. Charter Gas Engine Co. v. Charter, 47 Ill. App. 36; Moore v. Ensley, 112 Ala. 228; Brass v. Worth, 40 Barb. 648; Connell v. Clifford, 88 Pac. 850; Webb v. Allington, 27 Mo. App. 571; McClure v. Evartson, 82 Tenn. 495; Meyer v. Smith, 21 S. W. 995; White v. Langdon, 30 Vt. 599; Williams v. Storm, 46 Tenn. 203; Gruinbillot v. Abat, 6 Robt. (La.) 284; Bank v. Dobbins, 96 Mo. App. 693; Adair v. Brimmer, 74 N. Y. 554; Smith v. Howlett, 51 N. Y. Supp. 915; White v. Sherman, 168 Ill. 605; 1 Bispham's Hill on Trustees, 526; Smith v. Miller, 98 Va. 535; Clarke v. Lyon Co., 7 Nev. 75.

*Robert & Robert* for respondents.

(1) The court properly struck out the part of the petition which appellants contend pleaded fraud. "A mere charge of fraud, without specification of the acts which constitute the alleged fraud, amounts to nothing in pleading." Newman v. Mercantile Trust Co., 189 Mo. 423. This is so well settled and recently decided it is unnecessary to quote further authorities. (2) The contract for the sale of the Wiggins Ferry stock was not an option, but a valid, subsisting agreement. Newman v. Mercantile Trust Co., supra. (3) As the administrator in this case had express authority from three of the four distributees, the contract to that extent was binding on him. If the distributees did not have the authority to order the administrator to dispose of the assets, then the administration had not reached a point where they could maintain this action. The appellants were properly nonsuited, because at the time this suit was brought, one claim, amounting to $10 or $12, had not been paid. If this court takes the view of the trial court, that that was a

negligible claim, then the three adult distributees could direct the administrator to make any disposition they saw fit of their interest in the assets. State ex rel. v. Thornton, 56 Mo. 325; Clarke v. Sinks, 144 Mo. 453; State ex rel. v. Matson, 44 Mo. 305; State ex rel. v. Grigsby, 92 Mo. 419; Pound v. Cassity, 166 Mo. 426. (4) Under all the circumstances, the administrator acted with wisdom and good faith, and, therefore, the appellants were properly nonsuited. "The liability of executors and administrators has been too often discussed in this court and so firmly settled, that there is little or no ground for difference of opinion as to the measure of their responsibility. They occupy the position of trustees to those who are interested in the estate, which they undertake to administer, and are liable only for the want of due care and skill required of them, as that which prudent men exercise in the direction and management of their own affairs." Powell v. Hurt, 108 Mo. 507, 31 Mo. App. 632; Booker v. Armstrong, 93 Mo. 49; VanBidder v. Julian, 81 Mo. 618; Mosman v. Bender, 80 Mo. 579; Julian v. Abbott, 73 Mo. 580; Merritt v. Merritt, 62 Mo. 150; Gamble v. Gibson, 59 Mo. 585; Fudge v. Durn, 51 Mo. 264; State ex rel. v. Meagher, 44 Mo. 356. (5) It is true an administrator derives his authority from the statutes, and "if he depart from this rule, it must be in the exercise of such sound discretion as will bear the strictest scrutiny, and show the best faith. Cases must arise in the administration of estates of deceased persons which absolutely require the exercise of sound discretion on the part of the administrator who acts in the capacity of trustee. . . . He must exercise the same caution in the management, collection and protection of the assets that a prudent and careful business man would use in the care and management of his own business." Mosman v. Bender, supra. (6) None of the errors assigned with regard to market

value of stock are material, as appellants were properly nonsuited.

GANTT, J.—This is an action upon a bond given by Joseph Dickson, Jr., as administrator *de bonis non* of the estate of Andrew Warren, deceased, in the sum of twenty thousand dollars, with the St. Louis Trust Company, now the St. Louis Union Trust Company, as surety thereon, which said bond was executed and filed in the probate court of the city of St. Louis, September 28, 1901. The breach of the said bond alleged in the petition in substance is that on April 30, 1902, the defendant Dickson, as administrator as aforesaid, sold and delivered to the Mercantile Trust Company of the city of St. Louis, twenty shares of stock of the Wiggins Ferry Company, the property of the said estate of Andrew Warren, deceased, for five hundred dollars per share, without having an order of court to make such sale, when he could and should have received for such stock fifteen hundred dollars per share, and that the market value of said stock at said date was fifteen hundred dollars per share.

On motion the court struck out a part of the plaintiff's amended petition, to which ruling an exception was saved. The defendants in their answer admitted that the defendant Dickson was administrator, but denied that the bond given by Dickson was as set out in the petition, and denied the allegations of the petition as to the debts of the estate being paid, and denied that relator Carrie V. C. Wann paid a bill to David Nicholson against the estate, and that she canceled said bill, and denied that relators are the sole heirs of the said Andrew Warren. They admit that Dickson had as administrator possession of twenty shares of Wiggins Ferry Company stock and averred that he sold it on April 26, 1902, by the order of relators Carrie V. C. Wann, Andrew Warren, Jr., and Carrie Fay

Warren. Defendants admit that Dickson had no order from the probate court to sell said stock and denied that the probate judge had power to order the sale of personal property in vacation. Defendant also denied the allegations of the petition as to the sales, prices and values of said stock and denied that Dickson failed to perform his duties as administrator and denied any liability to plaintiff. Defendants expressly pleaded as a defense that Dickson signed an agreement to sell said Wiggins Ferry stock on April 26, 1902, at the express direction and request of Carrie V. C. Wann, Andrew Warren and Carrie Fay Warren, and delivered said stock on April 30, 1902, and received ten thousand dollars therefor at the express direction and request of said Carrie V. C. Wann, Andrew Warren and Carrie Fay Warren, and that said three relators fully ratified and confirmed the act of said Dickson.

The plaintiff filed a reply denying all the new matter set up in the answer.

Andrew Warren died and his widow, Mrs. Carrie V. C. Warren, was administering his estate. In 1901 she was married to Frederick A. Wann, and went to Chicago to live. On September 28, 1901, Joseph Dickson, Jr., was appointed administrator *de bonis non* of the estate of Andrew Warren. The heirs at law of Mr. Warren were his widow, now Mrs. Wann, Carrie Fay Warren, who has since the commencement of this action become the wife of Robert Davis Law, Andrew Warren and Van Court Warren, the latter of whom was a minor during the transactions out of which the present controversy arose. During all the times hereinafter mentioned Frederick A. Wann and his wife and her said children lived at Mr. Wann's residence in Chicago, No. 4137 Ellis avenue. The Wiggins Ferry Company was and is a corporation engaged in the transportation of passengers, teams and railroad cars between East St. Louis and the city of St. Louis across

State ex rel. v. Dickson.

the Mississippi river, owning ferry boats, railroad tracks and lands on both sides of the river. Its capital stock consisted of ten thousand shares of the par value of one hundred dollars per share. Mrs. Wann owned individually fifty shares of said stock. The estate of Andrew Warren had twenty shares of said stock left on the 24th of April, 1902. The sale of the said twenty shares of stock by the defendant, Dickson, as administrator, is the ground of this action. John Scullin, the president of the Wiggins Ferry Company, entered into an arrangement with the Chicago, Rock Island and Pacific Railroad Company whereby he agreed to submit to the shareholders of the Wiggins Ferry Company a proposal of that railroad company to purchase a majority or all of the stock of the Wiggins Ferry Company at five hundred dollars per share, provided the railroad company would agree to take the shares of every stockholder that wished to sell at that price. On April 24, 1902, John Scullin sent the following telegram to Mrs. Wann: "I am offered five hundred dollars per share for a majority of all of the stock of the Wiggins Ferry Company. Have agreed to sell all of my holdings and would strongly recommend you to do likewise. If you concur in my recommendation send me your stock by mail immediately, and if the owners of a majority of stock agree to sell I will forward you five hundred dollars per share for your holdings on or before May 5th, next. Please regard this as strictly confidential. Wire reply immediately.

"JOHN SCULLIN,
"President Wiggins Ferry Co."

That telegram arrived in Chicago about midnight of Thursday, April 24, 1902. Mrs. Wann replied on the same date, April 24, 1902: "Chicago, April 24, 1902, John Scullin, St. Louis, Mo. Many thanks. Will mail you my fifty shares in morning.

"CARRIE V. C. WANN."

Frederick Wann testified: "Possibly I wrote that telegram. I am willing to say I believe I did."

On April 25, 1902, Wann telegraphed defendant Joseph Dickson, Jr.: "Chicago, Ills. April 25, 1902. Joseph Dickson, Jr., Union Trust Bldg., St. Louis, Mo. Please wire me number of shares of Wiggins Ferry stock belonging to estate now in your hands. F. A. Wann." On the same day Dickson wired: F. A. Wann, Monadnock Bldg., Chicago, Ills. There are twenty shares Wiggins Ferry Company stock in my hands belonging to estate. Joseph Dickson, Jr. 2:32 p. m."

On the same day Frederick Wann wrote John Scullin as follows: "My dear Mr. Scullin, Since mailing you my letter this morning with Mrs. Wann's stock, I have just received a telegram from Mr. Joseph Dickson, Jr., who was administrator of my wife's estate. The stock which I mailed you, of course, is Mrs. Wann's personal property, but Mr. Joseph Dickson, Jr., as administrator, has twenty shares of Wiggins Ferry Company stock of which I wired you just now. I know that you will put this in on the same basis as Mrs. Wann's if the sale goes through. Thanking you for your kindness in this matter, believe me your friend. Fred A. Wann."

On the same day the following letter was sent: "Chicago, April 25, 1902. Mr. John Scullin, president Wiggins Ferry Co., St. Louis, Mo. My dear Sir: Many thanks for your telegram, which was received at my house late last night. I answered immediately that I would forward my stock this morning, so I take pleasure in enclosing you herewith fifty shares, certificate No. 293, and I trust the sale will go through as per your telegram. Yours very truly, Carrie V. C. Wann."

Frederick Wann testified that he dictated this letter to his stenographer, and Mrs. Wann signed it.

On the same day he sent the following telegram: "John Scullin, etc., St. Louis, Mo. My wife's estate holds twenty shares Wiggins Ferry stock. Have written Joseph Dickson to see her [him] if possible include it. 4:42 p. m. F. A. Wann."

On the same day Wann wrote the following letter to Scullin: "Chicago, April 25, 1902. My dear Mr. Scullin: Your telegram made us feel awfully good last night and I answered same immediately. It did not get to the house until 11:45 p. m. You have made a grand sale and I hope it will go through. I think Joseph Dickson holds some shares of Wiggins Ferry stock for the estate. I have telegraphed him asking the number and when I hear from him, I will telegraph you and request him to see you. I will, of course, not mention the price as you asked that it be considered private. Mrs. Wann and I appreciate your kindness very very much. I hope you were 'loaded' with it. Yours very truly, Fred A. Wann."

Mr. Wann sent the following letter to Festus J. Wade on the same day: "Chicago, April 25, 1902. My dear Festus: Your telegram also one from my good. friend Mr. Scullin received at my house last night at 7:45. I answered the letter immediately stating I would forward the Wiggins Ferry stock this morning, which I have done. I more than thank you for looking out for Mrs. Wann's interest. In this connection I was offered last week five hundred shares of the stock at $240, and am awfully sorry I did not telegraph Mr. Scullin asking his advice. It is true the party who offered it to me might not have been in a position to make the delivery, but it makes a fellow feel awfully sorry just the same that he did not take it. I expect to be in St. Louis in the very near future, when I will do myself the pleasure of calling on you and my good friend Mr. Scullin. Yours very truly, Fred A. Wann."

On April 25, 1902, Wann wrote defendant Dickson

as follows: "Mr. Joseph Dickson, Jr., Union Trust Bldg., St. Louis, Mo. My dear Sir: Your telegram advising me that you hold twenty shares of Wiggins Ferry stock belonging to the estate is received. Will you kindly get an order from the court immediately for the privilege of selling this, and call on Mr. John Scullin, my friend, who will put it on the same basis as Mrs. Wann's stock. This is very important and I trust you will give it your immediate attention. Very truly, F. A. Wann."

To this letter Mr. Dickson replied as follows: "St. Louis, Mo. April 25, 1902. F. A. Wann, Esq., Monadnock Bldg. Chicago, Ills. My dear Sir: At the request of Mr. John Scullin, president of the Wiggins Ferry Company, I called there this afternoon and I learned from him that all holders of the Ferry stock can if they so desire receive five hundred dollars per share for same, provided they agree before May 5th. He showed me a message from Mrs. Wann authorizing him to sign her name to that agreement and I take it that it is her wish and yours that I as executor also sign said agreement. This matter has come unexpectedly and yet I cannot help but feel sincere regret that the stock sold last summer was not held until now. Will you or Mrs. Wann please write me indicating your desire that I should sign said agreement. Please remember me kindly to your family, and believe me very sincerely, Joseph Dickson, Jr."

On the next day defendant Dickson wrote the following letter: "St. Louis, Mo. April 26, 1902. F. A. Wann, Esq., Chicago, Ills. My dear Sir: Your letter of yesterday evidently crossed mine. In reply to yours I would say that the probate court is not sitting just now, but that will not make any difference because I can easily get this sale of Wiggins Ferry stock at five hundred dollars approved by the court. I shall sign the agreement at once as I understand it is your

wish and Mrs. Wann's that I do so. Yours very truly, Joseph Dickson, Jr."

Defendant Dickson signed the said agreement accepting the proposition of the Mercantile Trust Company to purchase all or a majority of said stock at five hundred dollars per share provided the same was deposited with the Trust Company on or before May 5, 1902, and provided that the owners of a majority of the stock agreed to sell the stock at that price to the said Mercantile Company on April 26, 1902, at the St. Louis Club.

On Monday, April 28th, Fred Wann sent the following telegram: "Chicago, Ills., April 28, 1902. Joseph Dickson, Jr. Union Trust Bldg. St. Louis, Mo. If majority of Wiggins is turned over price is $600 per share. Please see to this. F. A. Wann."

On the same day Mr. Wann sent the following telegram: "Chicago, Ills. April 28, 1902. Joseph Dickson, Jr. St. Louis, Mo. Understand Wiggins Ferry stock is now $750 per share. Please do the best you can and advise. F. A. Wann. 11:47 a. m."

On the same day Dickson wired Wann: "St. Louis, Mo. April, 1902. F. A. Wann, Monadnock Bldg. Chicago, Ills. Have seen Scullin and Wade. They claim agreement binding to sell at $500.00. Will not offer more. Am writing. Joseph Dickson, Jr. 5:45 p. m."

On the next day Dickson wrote the following letter: "St. Louis, Mo. April 28, 1902. F. A. Wann, Esq. Monadnock Bldg. Chicago, Ills. My dear Mr. Wann: Since our conversation over the telephone this morning, I have received your two messages and have seen both Mr. Scullin and Mr. Wade with regard to obtaining a higher price for the Wiggins Ferry held by Mrs. Wann and by me as administrator. Both of these gentlemen take the same view of the matter as I do, to-wit: that we have entered into a binding agreement to deliver our stock to the Mercantile Trust Com-

pany at five hundred dollars a share. For my own part I desire to say that I shall deliver to the Mercantile Trust Company the certificate for twenty shares now in my possession for which I expect to receive ten thousand dollars less 2½ % commissions on that amount amounting to $250. It seems to me that the Mississippi Valley Trust Company are seeking to acquire a controlling interest in the Wiggins Ferry and are offering $600 cash upon delivery of the certificates, and perhaps more as your message indicates. It is to be regretted that we did not learn of this sooner, but at the time that I signed I had not heard that the Mississippi Valley Trust Company was in the field and I feel that the price obtained for said stock is or ought to be entirely satisfactory. At the request of Mr. Breck Jones of the Mississippi Valley Trust Company, I called there this morning and learned that they considered the agreement signed by us and of which I enclose a copy invalid, and not binding upon the subscribers thereto and to strengthen the mind of any one who does doubt them they had Judge Priest there to give his opinion. Be that as it may I consider that when I signed that agreement I bound myself to comply with its terms and I feel that you will take the same view. We have both acted to the best of our ability in the premises and while we shall always regret that we did not obtain the top price for the stock, still this was a matter which could not and cannot be helped. I desire to say that the Mississippi Valley Trust Company offer $600 per share for this stock and offer to indemnify the holder thereof who has signed the agreement with the Mercantile Trust Company against any loss if he will deliver his stock to him. The Mississippi Valley Trust Company thereby following out their assertion that the Mercantile Trust Company agreement is not binding on you. I simply add this for the purpose of fully informing you

of what facts are now within my knowledge. I have ventured to take issue with Judge Priest as to the binding effect of that agreement, at least so far as I am concerned, and I consider myself bound absolutely by its terms. I talked with Mr. Scullin about your telegram, but I got no other satisfaction than that he would assure you that his action in not offering more than $500 share now was perfectly proper. Trusting that this explanation may be full enough to acquaint you with the situation, I remain, very sincerely yours, Joseph Dickson, Jr. P. S. If you have any instructions for me please wire me or write me accordingly.''

The agreement which defendant Dickson signed is as follows: ''St. Louis, April 24, 1902. The Mercantile Trust Company acting herein for other parties offers to purchase a majority of all of the shares of the capital stock of the Wiggins Ferry Company, a corporation existing under the laws of Illinois, and agrees to pay therefor on the delivery of the certificates for so many of said shares not less than a majority as shall be deposited with said Trust Company on or before May 5, 1902, properly endorsed in blank for assignment and transfer on the books of said Wiggins Ferry Company, the sum of · five hundred dollars ($500) per share. The Trust Company acting in the capacity of agent of other parties is to receive from such other parties for its services a commission of 2½ % (two and one-half per cent) upon the purchase price of five hundred dollars per share in addition to said purchase price. The Mercantile Trust Company will not be obliged to accept any stock unless the owners of the majority of shares have agreed to sell the same to such Mercantile Trust Company, Agent, on or before May 5, 1902. Mercantile Trust Company, by Festus J. Wade, president.''

"The undersigned stockholders of the Wiggins Ferry Company do hereby accept the foregoing proposition and sell to the Mercantile Trust Company on and subject to the terms therein stated the number of shares of the capital stock of the Wiggins Ferry set opposite our respective names.

"Name.                    Number of Shares."

On Tuesday, April 29th, Wann telegraphed defendant Dickson as follows: "Chicago, Ills., April 29th.  Joseph Dickson, Jr., Union Trust Bldg., St. Louis, Mo.  Am advised Mercantile Trust Company has paid more than five hundred dollars for Wiggins Ferry stock in order to secure control.  Unless they pay you as much as they pay others they violate agreement.  If they do not get majority of capital stock by May 5th, what have you done to protect estate?  Mississippi Trust Company will give you $600 or more and no string to it.  As administrator I expect you to protect the estate.  Answer.  F. A. Wann, 11:22 a. m."

On the same day defendant Dickson wired Mr. Wann: "F. A. Wann, Chicago, Ills.  Legal opinions with respect to the contract signed by me for sale to Mercantile Trust Company are conflicting, but I cannot afford to violate the agreement and subject the estate to litigation and possible damages.  I can deposit stock at once and receive five hundred dollars a share and will do so if you desire or can hold for several days as we have until the 5th to decide upon finally.  Answer.  Joseph Dickson, Jr."

On the same day Mr. Wann telegraphed defendant, Dickson, as follows: "Omaha, Neb.  April 29th, 1902, 4:28 p. m.  Joseph Dickson, St. Louis, Mo.  I expect you to make your word good and get not less than ten thousand dollars net for the twenty shares, no commission to be deducted.  Answer.  F. A. Wann."

"Omaha" as the sending point of this telegram

is evidently an error as the dispatch was sent from Chicago, Mr. Wann having conducted all the correspondence from that city.

On the same day, April 29th, Mr. Wann wrote defendant Dickson as follows: "Chicago, April 29th, 1902. Private. Mr. Joseph Dickson, Jr., Union Trust Bldg., St. Louis, Mo. My dear Sir: Referring to your communication of yesterday received this morning, I note carefully all you say. Personally I would be the last one to do a dishonorable act; at the same time, if I find out later that the Mercantile Trust Company have paid others in advance, I think it is but right and fair that they should pay the stockholders the same amount especially when the stock was forwarded under the following telegram: 'I am offered five hundred dollars per share for a majority or all of the stock of the Wiggins Ferry Company. Have agreed to sell all of my holdings and would strongly recommend you to do likewise. If you concur in my recommendation send me your stock by mail immediately and if the owners of a majority of stock agree to sell I will forward you five hundred dollars per share for your holdings on or before May 5th next. Please regard this as strictly confidential. Wire reply immediately. John Scullin, president Wiggins Ferry Company.' I ask you if Mr. Scullin signing this official communication to a stockholder should not later have advised the stockholders of the conditions and gotten the last dollar offered for the property. I appreciate the fact that $500 is a splendid price for the stock, yet one thousand dollars a share is just twice as good. I just received this afternoon a check for twenty-five thousand dollars for Mrs. Wann's fifty shares. You said in your letter to me that a commission of 2½ % is made from the $500 per share. In this you are mistaken, it is the other party who pays the commission. I have just telegraphed you this afternoon as follows: 'I expect

you to make your word good and get not less than ten thousand dollars for the twenty shares, no commission to be deducted. Answer.' What I want to guard against and want you to guard against is in case the Mercantile Trust Company does not procure a majority of the stock and should turn around and sell Mrs. Wann's stock to the Mississippi Valley Trust Company or some other concern for an advanced price. Should they do this I would immediately sue for the difference. This I do not think under the circum-stances our friends would do, but it is one of the things that could be done. Please consider this as strictly confidential as it is simply my own views that I am expressing. Yours truly, Fred A. Wann." (In pencil below): "I expect to be in St. Louis Thursday, and am not sure that I will keep the $25,000 just received."

On Tuesday, 29th, defendant Dickson wired Wann as follows: "Omaha message received. Sell at ten thousand dollars net. Deliver tomorrow. Joseph Dickson, Jr. 6:06 p. m."

Other testimony on the part of the plaintiff was to the effect that at the date of the foregoing transaction all of the debts of Andrew Warren's estate had been paid before the commencement of this suit except a claim of David Nicholson for $9.18, which with interest amounted $10.33, and this claim was paid by Mrs. Wann May 20, 1903. This fact was alleged in the petition with the further allegation that Mrs. Wann waived all claims against the estate therefor.

Frederick Wann was a witness and testified that at the time of these transactions in April, 1902, he was the general freight agent of the Chicago & Alton Railroad. That said railroad had something over 3,600 miles of track. He testified that he received a copy which the defendant Dickson signed on Tuesday, April 29th, 1902; that he sent the telegram of that date

reading, "Joseph Dickson, I expect you to make good your word and get not less than ten thousand dollars net for the twenty shares, no commissions to be deducted." That when Dickson replied to that message as the "Omaha" message, witness presumed he referred to the message which had erroneously been dated Omaha. He testified that he advised his wife in regard to the letters and telegrams that passed between him and defendant Dickson. The first conversation with Andrew Warren in regard to the sale of the Wiggins Ferry stock took place on Sunday, April 27th, when Andrew noticed a few lines in the Chicago paper about it being sold. Wann testified that we, that is his wife and himself, told him then of Scullin's offer of five hundred dollars per share. Up to that Sunday he had not communicated the contents of the letters and telegrams to Andrew and Miss Carrie Warren. He had stated to them his utmost confidence in Mr. Scullin and his belief that Mr. Dickson was a good friend of the family. He and his wife started to St. Louis on Wednesday morning. Andrew and Miss Carrie knew that they were going to St. Louis on that business. On Sunday morning he received Mr. Church's telegram notifying him of the offer of the Mississippi Valley Trust Company of $600 per share conditionally. On Tuesday, the 29th of April, he was told by Mr. Felton, the president of the C. & A., that he had been informed that $750 was offered for the stock and Moses Rumsey, his brother-in-law, telegraphed him on that day from St. Louis, at 9:40 in the morning, not to tie up the stock, that $750 was the price the day before. He knew on Sunday, Monday and Tuesday that Wiggins Ferry stock was being sold for more than $500 per share. He received Dickson's letter enclosing a copy of the agreement, which the latter had signed on Saturday afternoon. It may have reached him in the morning, but it was after he had received the

check for $25,000 for Mrs. Wann's stock. Asked what he meant by the expression, "I expect you to make you word good," he answered: "Mr. Dickson was obliged as he notified me that the estate would be subject to litigation if he did not carry out his word." Asked if he did not by that telegram mean to say that Mr. Dickson was to deliver the stock and take ten thousand dollars net for it, he answered that he did not, and that the telegram did not read so. After a careful reading and an examination of the meaning of this telegram his explanation is entirely unintelligible and unsatisfactory. He testified further that he talked to both Andrew Warren and Mrs. Law on Sunday, April 27, 1902, after receiving Church's telegram stating that the Mississippi Valley Trust Company would pay $600 per share on condition that they get a majority of the stock; that they knew that he had requested Mr. Dickson to get an order from the court for the sale of this stock and that the purpose of that order was to sell the stock. He was asked when he next spoke to them in regard to the matter and he said possibly Monday evening, or Tuesday evening. He told his wife every night all that he had done in regard to this matter during the day, and spoke about it at the dinner table at which she and both of the children were present. They were all living together in the same house in Chicago. He advised them also of the receipt of Church's telegram and informed them on the 29th that the stock had advanced to $750 per share. When the witness denied that he was authorized to send these letters and telegrams to Mr. Dickson in regard to the sale of this stock, he was asked if he was concealing anything from them, and he answered, "Absolutely not." Q. "You were not working on, attending to and intermeddling with this estate without letting them know what you were doing?" Ans. "No, sir, I testified to that." Q. "In a general way

then they knew what you were doing throughout the entire transaction?" Ans. "From Sunday on." He testified further that he never heard of their communicating to the administrator any protest against witness interfering in the matter or advising Mr. Dickson that he [witness] had no authority to represent them. When asked why he sent these letters and telegrams, when he had no authority, he answered: "I do not know, I feel I only had the interest of the children at heart and Mrs. Wann's." On the 28th of April, he advised them what he had done. Told them all about it. He testified that after he received Mr. Dickson's telegram Sunday morning stating that he would deliver the stock he did not communicate with him before leaving Chicago for St. Louis. He testified that no member of the family made any objection to what he had done down to the time Dickson had delivered the stock.

Plaintiff also offered evidence of various parties to the effect that the Mercantile Trust Company paid them more than $500 per share for the Wiggins Ferry stock after the contest over the ownership between the Mercantile Company and the Mississippi Valley Trust Company began. In each of these cases, however, the sales were private and most of them under a promise of secrecy. None of these witnesses testified to having said anything to Mr. Dickson in regard to the said sales until after he had signed the agreement. Up to the time that the Mercantile Trust Company offered $500 per share for the stock, the highest price for which it had ever sold was $240 per share.

Andrew Warren testified that he first learned of the advance in the price of the Wiggins stock on Sunday, April 27th, from an item in the newspaper, and that he took the paper upstairs and showed it to Mr. and Mrs. Wann. So far as he could remember they said nothing and he went down stairs again. The

next time that he remembered about it was when Mr. Church's telegram was showed him on Sunday, the 27th. Mrs. Wann and her husband did not ordinarily talk business affairs with him. He was not positive whether he had any interest in the estate or not, but afterwards said he did have an interest in it. Something was said in the conversation on Sunday, April 27th, which satisfied him that there was Wiggins Ferry stock in the estate, in which he had an interest. He did not ask his mother or his stepfather whether they intended to sell or not, nor what reply they would make to Church's telegram. He learned that the Mercantile Trust Company had made an offer of $500 per share, but neither his mother nor Mr. Wann told him what they intended to do about that offer. He testified that $500 was a good figure for the stock considering that the last sale that he had heard of was $235. He was asked if he did not know or at least believe that the stock of the estate was going to be sold and answered that he imagined that Mr. Dickson would sell it. He had known Mr. Dickson all his life, but he made no effort to communicate with him in any manner in regard to the sale of this stock; that he himself did not interfere one way or another. Wann did not tell him that he intended to represent him in directing Dickson to make the sale. The first he learned about the matter was the 30th of April.

Mrs. Carrie Fay Warren Law testified she had no direct communication with defendant Dickson in regard to the sale of the twenty shares, but she knew from her mother and Mr. Wann that the stock was to be sold. She was advised of the rise in the stock and the proposed sale, but she considered that Mr. Wann, her mother and Mr. Dickson, the administrator, were looking after the matter and she was entirely satisfied to let them look after her interest. She left her in-

terest to Mr. Wann, her mother and the administrator and did not undertake to take any part in the sale.

Mrs. Wann testified that she received Mr. Scullin's telegram of April 24, 1902, and knew of the one sent by her husband to defendant Dickson on April 25, 1902, inquiring for the number of shares still belonging to the estate and of the Church telegram. That every night during that time her husband, Frederick Wann, told her what had been done in the Wiggins Ferry stock matter during the day; that she and her husband came to St. Louis Wednesday morning, April 30, 1902, and reached there about seven in the evening. She knew of the letters, including the one directing defendant Dickson to get an order of court to sell the estate stock. She was present on Sunday, the 27th, when the matter was talked of with Andrew and Mrs. Law. Asked if she told them they were going to sell the stock of the estate, she said it was mentioned. Q. "It was made clear?" Ans. "Yes, sir, I think it was mentioned in every way." Neither she nor Andrew nor Mrs. Law made any objection to a single thing that Mr. Fred Wann did in connection with this transaction. She did not notify Mr. Dickson that Mr. Fred Wann had no authority to represent her. The family were harmonious. There was no trouble about that matter until she and Wann reached St. Louis. She thought $500 was an insignificant price for the stock. Neither of the children were present when she placed this case in the hands of her counsel.

Philip Scanlan testified that either on Friday or Saturday before the agreement was signed by defendant Dickson, he met Mr. Dickson in the hall on his way to Mr. Scullin's office, in response to a communication from the latter in regard to the sale of the Wiggins Ferry stock. Witness was an officer of the company. After saluting each other, Dickson told witness he was about to act for some shareholders and in reply wit-

ness told him not to be in a hurry; he had until May 5th and witness's family had not acted; that there might be something better and he would let him know. Dickson in that conversation told him he represented the Warren estate shares. He told me he was going to act. On cross-examination, witness stated that at that time he did not know of any other buyer for the stock. Dickson did not ask his advice. He stated he did not go to the length of giving him positive advice not to accept Scullin's offer. He never knew the stock prior to that time to bring over $230 or thereabouts.

At the close of plaintiff's testimony the defendant asked the court to instruct the jury that under the evidence plaintiffs could not recover and that Carrie V. C. Wann, Andrew Warren and Carrie Fay Law could not recover, which instructions the court gave, and thereupon the plaintiffs took a nonsuit with leave to move to set the same aside and in due time filed their motion to take off the nonsuit, which the court overruled, and thereupon in due form they perfected this appeal.

I. The first question is whether this action was premature because when the original petition was filed in the case, there was an unpaid allowance in favor of David Nicholson to the amount of $10.33, which had been overlooked and after the commencement of this suit and before the filing of the last amended petition was paid by Mrs. Wann, and in the petition she waives all claim to reimbursement therefor from the estate. By a long course of adjudications in this State, it has been ruled that the distributees of an estate after the debts are all paid have their right of action on the administrator's bond whether final settlement by the administrator or order of distribution by the probate court has been made or not. In view of the smallness of this unpaid claim and the fact

that it was paid before the last amended petition was filed and Mrs. Wann has as a matter of record disclaimed any right to reimbursement therefor, we are, of the opinion that the existence of this simple item at the commencement of the suit, which was liquidated as soon as it was discovered, ought not to bar the plaintiffs' right of action, if they have any. [Pound v. Cassity, 166 Mo. l. c. 426; State to use v. Campbell, 10 Mo. 725; State to use v. Morton, 18 Mo. 53; State ex rel. v. Matson, 44 Mo. 305; Morehouse v. Ware, 78 Mo. 100.] Considering the size of this estate and that all of the other debts had been paid, this small unpaid allowance may well be treated as a negligible quantity and no obstacle to the right of the plaintiffs to bring their action for the alleged breach of defendant's bond.

II. Proceeding then to the merits of the case, two distinct propositions of law arise upon the facts disclosed by the plaintiffs' case. The first is the measure of the defendant Dickson's liability as administrator to the relators, Mrs. Carrie V. C. Wann, and Mrs. Carrie Law and Andrew Warren, in view of their participation or non-participation in causing the sale of the twenty shares of Wiggins Ferry stock belonging to the estate of Andrew Warren, deceased. On the part of the plaintiffs, it is insisted that the defendant Dickson having sold the said stock without an order of the probate court at private sale, it was his own risk and he is bound to respond to the beneficiaries of the estate for the difference between the price which he actually obtained and that which he might have obtained. The liability of executors and administrators has often been before this court and there is little or no ground for difference of opinion as to the measure of their responsibility. They occupy the position of trustees to those who are interested in the estate which they undertake to administer, and are liable

for the failure to exercise that due care and skill which
prudent men exercise in the transaction and manage-
ment of their own affairs.  As said by this court in
Chandler v. Stevenson, 68 Mo. l. c. 453, "The method
of performing this trust and the duties arising out
of it are regulated by the statute."  Had the defendant
Dickson pursued the method pointed out by the statute
for the sale of this stock, i. e., had he petitioned the
probate court for an order of sale and obtained the
same and sold the stock for $500 per share, there would
have been absolutely no foundation whatever under
the evidence in this case for this action on his bond.
His letter of April 25, 1902, to Mr. Frederick Wann
shows that he was under the impression that he could
not obtain this order from the judge of the probate
court in vacation, but would have to wait for a regular
term of that court.  He was evidently mistaken as
to this.  Section 117, Revised Statutes 1899, provides:
"*When private sale may be had for reinvestment or
other purposes*.  If any executor or administrator ap-
ply to the court, or to the judge thereof in vacation,
for permission to sell the personal estate of the de-
ceased, or any part thereof, at private sale, for rein-
vestment or other purposes, and the court, or the judge
thereof in vacation, be satisfied that such sale would
not be prejudicial to the persons interested in the es-
tate, the court, or the judge thereof in vacation, may
order such sale and prescribe the terms thereof."  The
fact that he did not obtain this order is one of the
main complaints of the plaintiffs.  Had he gone to the
probate court with his application for the sale of this
stock, reinforced by the urgent demand on the part
of Mr. Frederick Wann, who in this transaction un-
questionably represented his wife, Mrs. Carrie V. C.
Wann, and Mrs. Carrie Law, that he should sell this
stock on the same basis that Mrs. Wann's stock was
selling for to the Mercantile Trust Company, there can

be little doubt that the probate court would have made the order, especially when it was advised that the administrator would thereby be getting an amount double the value of what the stock had ever been quoted at or sold for prior to that date, and when at that time there was no other bidder in the field for the stock known either to Mr. Dickson or Mrs. Wann.

While it is contended that Mr. Wann had no authority to represent his wife and her children in this transaction, we think it is too plain for discussion that he did act for and represent them with their full knowledge and acquiescence in everything that he did in connection with the matter. It is exceedingly important in weighing the responsibility of Mr. Dickson in regard to the sale of these twenty shares to keep in mind the order of events as they transpired at that time. Mrs. Wann individually owned fifty shares of this stock and the Warren estate twenty shares. The transaction opens on Thursday, April 24, 1902. It began by Mr. Scullin sending a telegram to Mrs. Wann advising her that he was offered five hundred dollars per share for a majority or all of the stock of the Wiggins Ferry Company, and that he had agreed to sell his holdings at that figure and strongly recommended her to do likewise. The price was so great that Mrs. Wann at once replied by telegram that night that she would mail her fifty shares next morning and expressed great thanks for Mr. Scullin's kindness in notifying her. This was Thursday night. On the next day Frederick Wann, at his wife's request, wired defendant Dickson to know how many shares of this stock remained in his hands as administrator of Mr. Warren, and Dickson replied the same day that he had twenty shares. On the same day Mr. Wann wrote Mr. Scullin that the stock which he had mailed him was Mrs. Wann's individual property, but added, "But Mr. Joseph Dickson, Jr., as administrator, has twenty

shares of Wiggins Ferry stock of which I wired you just now. I know that you will put this in on the same basis as Mrs. Wann's, if the sale goes through.'' Prior to writing this letter Wann telegraphed Scullin: ''My wife's estate holds twenty shares Wiggins Ferry stock, have written Joseph Dickson to see him [you]. If possible include it.'' On this same day Wann wrote Mr. Scullin another letter in which he said: ''You have made a grand sale and I hope it will go through. I think Joseph Dickson, Jr., holds some shares of stock for the estate. I have telegraphed him asking the number and when I hear I will telegraph you, and request him to see you.'' On this same Friday he wrote defendant Dickson: ''Will you kindly get an order from the court immediately for the privilege of selling this and call on my friend Mr. Scullin, president of the Wiggins Ferry Company, who will put it on the same basis as Mrs. Wann's stock. This is very important and I trust you will give it your immediate attention.'' This letter reached defendant Dickson in due course of mail on Saturday, 26th of April. Dickson in obedience to Wann's telegram had called on Mr. Scullin on Friday and on that day wrote Wann: ''I take it it is her wish and yours that I as executor also sign said agreement. . . . Will you or Mrs. Wann please write me indicating your desire that I should sign said agreement.'' This letter reached Wann Saturday morning, but Wann's letter telling him to get the order to sell and that Scullin would put the stock in on the same terms as he had Mrs. Wann's, reached Dickson that same morning and accordingly on Saturday evening Dickson signed the agreement and wrote Wann that their letters evidently had crossed and said to him, ''I shall sign the agreement at once as I understand it is your wish and Mrs. Wann's that I do so.'' In view of these urgent directions and requests made on behalf of Mrs.

Wann and Mrs. Law with their full knowledge and consent, the insistence of the plaintiffs' counsel that the defendant Dickson acted without any direction and in defiance of the wishes of Mrs. Wann and her children, it seems to us is controverted by all the facts in the case. The initiative was taken by them through Frederick Wann before the defendant Dickson had heard of the purposed purchase by the Rock Island Railroad Company. No fair-minded man can read this record without being impressed that Mrs. Wann and Mrs. Law were anxious to secure for the estate stock five hundred dollars per share, which was considered an exceedingly fine price for it. In view of the prices which it had theretofore brought the whole trend of the dispatches of Frederick Wann, in their behalf and in behalf of the estate, was to impress upon defendant Dickson the necessity of immediate action upon his part to obtain the same price which Mrs. Wann had agreed to take for hers.

Recurring now to the theory upon which this suit is brought, to-wit, that these adult distributees of the estate of Andrew Warren had such a vested interest in said stock, all the debts having been paid, that they could recover from defendant Dickson for any mismanagement of the said estate, so far at least as they were concerned he had a right to rely upon their approval of his action in signing the agreement to sell the stock for five hundred dollars per share. While he did not get the protection which an order of the probate court would have given him as to these two devisees he acted under their direction, and it can make no difference as to them whether he got the order or did not get it. The obtaining of the order as far as they were concerned was simply a means to the end which they desired him to attain. But the burden of their complaint seems to be that prior to the delivery of the stock, it became known that it was selling for

as much as $600 to $700 and $750 per share in certain
instances. Late Saturday afternoon on the 26th of
April, 1902, the contest over the control of the Wiggins
Ferry Company stock, by the Rock Island Railroad on
the one side represented by the Mercantile Trust Com-
pany, and the Terminal Railroad Company of St. Louis
on the other side represented by the Mississippi Valley
Trust Company, began in earnest. The first that the
defendant Dickson knew of the Mississippi Valley
Trust Company being in the field for this stock was
on Sunday morning after he had signed the agreement
the evening before. After the latter company entered
upon the scheme of obtaining the control of the Wiggins
Ferry Company stock, the price for this stock varied
with each purchase, these purchases being for the most
part secret except the offer of the Mississippi Valley
Trust Company of $600 on condition that it acquire
a majority of the stock. We agree with the learned
circuit judge who tried this cause that this condition
of affairs could not be called a market so as to im-
press upon the stock what is commonly known as a
market value. The Mercantile Trust Company had
fixed the price for every stockholder who saw fit to
avail himself of the offer of $500 per share, whereas
the Mississippi Valley Trust Company offered $500
per share, with the further condition that if it ac-
quired a majority it would give $600 per share. This
condition of affairs was such that the moment that
the Mississippi Valley Trust Company should acquire
a majority the price of the remainder or minority
stock would have been entirely problematical, and it
is in view of these conditions that the various tele-
grams and letters which passed between Mr. Wann
on behalf of his wife and Mrs. Law must be read to
be understood. Mr. Wann in his testimony indicates
his fear that at any moment one or the other of the
companies might acquire the majority of the stock

and leave the minority of stockholders in the lurch. In this correspondence, it appears that the defendant Dickson candidly and openly advised Mr. Wann of the whole situation as far as he was advised. He furnished him with a copy of the agreement, which he had signed; he wrote him frankly of the position which the Mississippi Valley assumed in regard to the invalidity of his contract, strengthened by the advice of distinguished counsel, and also the claims of the Mercantile Trust Company people that they would hold him and the estate to his agreement. In the very beginning of the correspondence defendant Dickson requested Wann or Mrs. Wann to write him indicating their desire as to his signing the agreement, and then after seeing Mrs. Wann's message to Scullin, he notified Mr. Wann that he understood from that that Mrs. Wann desired him to sign the agreement. In quick succession then Mr. Wann wired the information that he had received in Chicago, that the price was fluctuating from $600 to $750 per share. Dickson then informed him that Scullin and Wade insisted that the agreement was binding. He then wrote a letter on the 28th to Mr. Wann in which he expressed the opinion that he had bound himself to comply with the terms of the agreement when he signed it. This correspondence, with the telegram, finally culminated on the 29th of April, 1902, in a telegram from Wann to Dickson, in which he said, "I expect you to make good your word and get not less than ten thousand dollars net for the twenty shares, no commission to be deducted." Dickson had just wired him that he could deposit the stock at once and receive five hundred dollars per share, and added, "I will do so if you desire, or can hold for several days as we have until the 5th to decide upon final action." And it was in response to this telegram that Mr. Wann advised him

213 Sup—7

that he expected him to make his word good and get not less than ten thousand dollars net for the twenty shares. This telegram advising Mr. Dickson that he was expected to make good his word, clearly refers to Mr. Dickson's statement to him that he could get $500 per share, but would hold for several days according to his advice. Mr. Dickson's word was out, as he had explained to Mr. and Mrs. Wann, to the effect that he had obligated himself to sell this stock to the Mercantile Trust Company for five hundred dollars per share. Wann's dispatch that he expected him to get ten thousand dollars net could not have referred to anything else but this. And his attempted explanation of a different intention on his part seems to us without any substantial basis whatever. Thereupon, the defendant Dickson notified him that he would make the delivery, and he was not directed to hold the stock or refrain from delivering it until Wann could arrive in St. Louis. If Mr. and Mrs. Wann and Mrs. Law desired defendant Dickson to refrain from delivering that stock common justice required that they should at once wire him to that effect. Compelled to act in the light of the letters and telegrams which he had received from Mr. Wann, who was acting, as we have seen, at least for his wife and Mrs. Law, and acting under a sense of his obligation incurred by the signing of the agreement, the defendant delivered the stock, and in our opinion these two plaintiffs, Mrs. Wann and Mrs. Law, were bound by his action and have no cause to complain.

As to the plaintiff Andrew Warren, his testimony might or might not in the opinion of the jury, and taken in connection with the testimony of his mother, Mrs. Wann, and his sister, Mrs. Law, amount to a knowledge and ratification that this sale was made with his consent and approbation. Van Court Warren was at this time a minor, and of course Frederick

Wann could not be considered his agent so as to bind him.

We have no doubt whatever that the circuit court correctly held upon the plaintiffs' own testimony that Mrs. Wann and Mrs. Law could not recover. The serious question in the case is whether, in view of all the facts and the testimony in the case, the case should not have been submitted to the jury upon proper instructions as to Andrew Warren and Van Court Warren. There is no evidence in this record which tends in the least to indicate any fraudulent action upon the part of Mr. Dickson. As administrator, as we have already said, he was bound to exercise due diligence and perfect good faith in the sale of this stock for the benefit of the beneficiaries of the estate. The majority of the evidence as to the higher prices received for the stock, after he had signed the agreement to sell at $500 per share, was to the effect that these sales were private and defendant Dickson knew nothing of the amounts paid. There was evidence that he was advised before he delivered the stock that it was selling for $600, $700 and $750 a share, but there was no testimony that he was offered such a sum. He knew the offer of the Mississippi Valley Trust Company for $500 certain and $100 additional if that company acquired the majority. In his letter of April 28, 1902, to F. A. Wann, defendant said the Mississippi Valley Trust Company was offering $600 cash upon delivery of the certificates and perhaps more. That defendant had no authority to sell this stock at a private sale without an order from the probate court is entirely clear and that in so doing he took the risk upon himself, so far at least as the rights of Van Court Warren are concerned, we take it there can be little or no doubt under the decisions of this court and the statute. Having sold without the protecting order of the probate court, it devolved upon him to

show that no loss resulted to these distributees by his unauthorized sale. The action is for a *devisavit*. Notwithstanding he acted without authority, if they suffer no damage, they cannot complain. The relators made no effort to replevy the stock in kind. The form of action concedes the title to the stock passed but they ask damages for the difference in price which they lost by this sale. As already said, there was no evidence whatever on which to submit to the jury the question of fraud. Neither does it appear there is the slightest ground to question the perfect good faith of the defendant, but notwithstanding this, if under all the circumstances and with the facts surrounding him, he did not act as a prudent man would have acted in the circumstances, he is bound to respond to the two relators Andrew and Van Court Warren for any loss they have suffered by his unauthorized and imprudent sale. Whether he did so act is we think a question of fact upon which they are entitled to a trial by a jury under proper instructions. In the trial of such an issue, the evidence admitted of newspaper articles as to the value of the stock we think was inadmissible. The evidence that other stockholders received $800 and in some instances $1,500 for their stock, at private sales made under the injunction and promise of secrecy, was incompetent to fix the liability of defendant. These unusual transactions did not establish the true or market value of this stock and defendant's conduct is not to be measured thereby. The evidence shows that there was a persistent effort on the part of both Trust Companies to prevent the knowledge of their transactions, in which they were paying over $500 in the one case and $600 conditionally in the other, reaching the public. The liability of defendant in this regard depends upon his knowledge that a greater price than $500 a share could be obtained by him or knowledge that he could have obtained by the exercise of that care and pru-

dence which a prudent man could have obtained, not the idle rumors of the price or newspaper articles on the subject, nor the fact that these extraordinary sales subsequently developed. His liability for a greater sum than he obtained must be determined by the knowledge he had before he delivered the stock of such increased price or such knowledge as he could have obtained by the exercise of that care and prudence which a prudent person would have exercised. There is evidence that he could have realized $600 per share from the Mississippi Valley Trust Company and that the Mercantile Trust Company refused to grant any increase of the $500 a share which they offered. There was also evidence that the stock sold in at least one instance for $750 to an outsider, without any injunction as to secrecy. This evidence was competent under the doctrine announced in Brinkerhoff-Farris Trust & Savings Co. v. Lumber Co., 118 Mo. l. c. 461, 462, and cases cited. We think the defendant had the clear right to show what the market price of this stock was up to the 25th of April, 1902, and the exceptional circumstances under which it advanced and the conditions under which he agreed to sell it for $500 a share, as evidence of his entire good faith and the prudence and skill he exercised in selling it. Indeed we see nothing in the evidence indicating in the slightest degree any lack of good faith in the transaction. The case is narrowed down to the sole question of whether, by the exercise of that caution and skill which a prudent man in the same or similar circumstances would have exercised in obtaining the best price for the stock, he could have obtained a higher price for it. Having neglected by an error of law to obtain an order to sell at private sale for $500, the law casts the risk of his conduct on him and his good faith alone will not exonerate him from any consequent damages resulting from a lack of prudence and judgment in selling the

stock, notwithstanding the conduct of Mrs. Wann and Mrs. Law in urging the sale, as they could not bind the other two relators, though their judgment and conduct in the premises may well be taken into account when passing upon his prudence and skill or otherwise.

. What we have said as to Andrew Warren is not to be understood as precluding the defendant from tendering the issue as to him of a knowledge and consent to the sale at $500. If the jury should find for defendant on that issue, then of course he cannot recover at all. He will be entitled to recover, if at all, only in case the jury finds that he was not consenting, along with his mother and sister, to the direction to defendant to sell the stock for $500 a share.

Accordingly, the action of the circuit court in sustaining the demurrer to the evidence as to the relators Mrs. Carrie V. C. Wann and Mrs. Law is affirmed, and is reversed as to the other two relators, Andrew and Van Court Warren, and the cause remanded for a new trial in accordance with the views herein expressed.

*Fox, P. J.,* and *Burgess, J.,* concur.