THOMAS J. KEGAN, Appellant, v. PARK BANK OF ST. JOSEPH.—8 S. W. (2d) 858.

Division One, July 3, 1928.

624

*Randolph & Randolph* for appellant.

*Culver, Phillips & Voorhees* for respondent.

628

ELLISON, C.—This is a suit in trover for $47,830.22 for the alleged conversion of certain securities. From a judgment on the verdict for defendant the plaintiff appeals. The respondent is a banking corporation at St. Joseph organized and operating under the laws of Missouri. Of the amount sued for $4575.22 represents interest earned up to the date of demand. The face value of the securities was $43,255. They consisted of securities to the value of $35,250 which are alleged to have been taken from appellant's strong box while gratuitously held in the care and keeping of the respondent bank, $200 in Liberty Bonds which were similarly in the custody of the bank in its own vault, and $7805 in mortgage notes which were up with the bank as collateral to secure the indebtedness of the appellant's brother. These misappropriations, if and insofar as committed, all appear to be chargeable to a defaulting assistant cashier of the bank, who had been discharged and invoked his constitutional exemption against testifying.

The errors assigned arise out of the giving of fourteen instructions for defendant, the refusal of eight instructions requested by plaintiff and the modification of another, and the admission of evidence. Underlying them are three legal questions to which counsel for the respective litigants have especially addressed themselves:

(1) Were the books of the bank, its ledgers, note registers, etc., properly admissible in evidence against the plaintiff, a stranger to the transactions shown, and did the court rightly permit the bank's officers to testify therefrom, or were they hearsay evidence and self-serving?

(2) As to the securities in the strong box and the Liberty Bonds in the vault, was the bank a gratuitous bailee, because it made no charge for its service in keeping them, or did the fact that the ap-

pellant favored the bank with his general banking business make the latter a bailee for hire, in such sense that it is liable for the theft of the securities by the assistant cashier, though without knowledge of his dishonesty and having no reasonable ground for suspicion?·

(3) As to the notes up for collateral, was it necessary for the appellant to pay off or tender the amount of his brother's debt, for which they were pledged, in order to maintain his action for the conversion thereof; and does the fact that the brother's indebtedness remained unpaid at the time of the trial, in an amount exceeding the value of the pledged notes, defeat the appellant's right to recover therefor?

The record of nearly 1000 pages is hard to follow. Witnesses testifying from the many books and papers, introduced often, referred to items and notations thereon as "this" and "that," and in more than a few instances the documents mentioned are not preserved in the record. The statement of facts will be shortened as much as possible, but it will necessarily be long.

The appellant, Thomas J. Kegan, had been a customer of the respondent Park Bank for about fourteen years. For some eight or ten years he had kept his papers in a tin box in the money vault of the bank. The box had two keys, but these also were left at the bank, accessible to its officers, and on one occasion, the evidence indicates, the box was left unlocked. It was purchased by the appellant on the advice of a bank officer and was not furnished by the bank. Some fifty or sixty other customers kept similar boxes there. It was an accommodation extended to them by the bank for which no charge was made, and the cashier of the bank testified it was not contingent on their being regular bank customers.

The assistant cashier was James F. Reardon. He had been in the bank's service nearly twenty years. He owned eleven shares of the capital stock of $50,000 and was also a director. He did some work at the tellers' windows, waited on customers, exercised a supervisory control over the books, made loans, set the time lock on the money safe at night, carried a key to the bank and knew the combination of the tumbler lock on the vault door. He was an active officer. Up to the summer of 1923 he held the confidence and esteem of the public and of his fellow officers and employees. About the middle of August he came under suspicion and was given an enforced vacation while the other bank officers made an investigation. It was found he had been guilty of irregularities and defalcations.

For several years prior to this denouement the appellant, Tom Kegan, and his brother John, were on terms of business intimacy with Reardon, that is, they did most of their banking business at the bank with him personally, and were interested with him in

private enterprises. They were associated in one venture in oil and they traded in city real estate, the deeds being taken either in blank or in Reardon's name, and he being interested sometimes with one brother and sometimes with the other in these transactions. The appellant testified that on two occasions he purchased diamonds from Reardon, for which he paid $2500; and on one occasion in 1919 loaned him $1000 on his personal note with collateral. It seems they were interested also, more or less, in the automobile business, and Reardon and John Kegan together owned a large hog ranch for about two years and operated it for four years—of this more later. John Kegan testified that all together the private business ventures of his and Reardon's lost from $20,000 to $30,000.

The appellant's testimony was that on or about August 15, 1923, he went to the bank and asked Reardon for his box. This was about two days before Reardon's exposure, and before the appellant knew anything of his trouble. The securities were gone. Except for some worthless papers the box was empty. It had the appearance of having been pried open. Reardon told him the securities were in the bank where the Liberty Bonds and gold were kept, and to come in the next morning. The next morning appellant found the blind in front of Reardon's window pulled down. One of the other employees said Reardon had gone on a vacation. Two days later appellant demanded his securities from Mr. Stinson, the cashier. The latter said things were "all muddled up" and that the condition was brought about by Reardon's dealings with a man in St. Joseph whom he named.

Thus, according to appellant, the fact was brought to light that his securities were gone. It later developed that some of them had been put up as collateral by Reardon at the respondent Park Bank and some at the First National Bank in St. Joseph. Some have never been found. But before going further into the history of the case it would be better to set out a list of the securities in detail, as it will be necessary to refer to them frequently hereafter.

## Securities in Strong Box

### Second Mortgage

**Bank No. 18296**

T. J. Kegan note to Park Bank, No. 1, $2,000
" " " No. 2, 3,000
" " " No. 3, 3,000
" " " No. 4, 3,000
" " " No. 5, 3,000

All notes dated Dec. 7, 1921, due in 5 years, secured by 2nd mtg. on part of R. & K. hog ranch, acknowledged Dec. 30, 1921, recorded Jan. 5, 1922, subject to 1st mtg. of $8000.

### First Mortgage

**Bank No. 18297**

" " " No. 1, 3,000
" " " No. 2, 3,500
" " " No. 3, 3,500

All dated Dec. 7, 1921, due in 5 years, secured by 1st mtg. on part of R. & K. hog ranch, acknowledged Dec. 30, 1921, recorded Jan. 5, 1922.

### First Mortgage

**Bank No. 18298**

" " " 4,000

Note dated Dec. 7, 1921, due in 5 years, secured by 1st mtg. on part of R. & K. hog ranch, acknowledged Dec. 30, 1921, recorded Jan. 5, 1922.

Undivided interest in R. G. Lewis $6500 mtg. note 6,000

J. F. Reardon note for, 1,000 — Secured by 3 shares of stock in Park Bank as collateral.

United States Baby Bonds 250

Total securities in box $35,250

### Securities in Bank Vault

Liberty Bonds, as per receipt of bank, .......... 200

### Securities up for collateral

Victor H. Nelson note ($5800 originally), ...... 5,000

Moore note for ........ 2,000

J. E. Swope note for $850 less $45 credit .......... 805

Total securities ........$43,255

Referring first to the entire issue of $28,000 in notes payable to the Park Bank, signed by T. J. Kegan and secured by mortgages on the R. & K. Hog Ranch. Between 1912 and 1919 appellant and his brother John were partners in 'the liquor business. While Tom was in the Navy during the World War, John speculated in oil and lost. On January 1, 1919, he turned over to Tom his interest in the saloon in settlement of his indebtedness to Tom. Thereafter, in the spring or summer of 1919, John and Reardon, the assistant bank cashier, purchased a 313-acre farm near St. Joseph which they called the ''R. & K. Hog Ranch.'' The title was taken in Reardon's name. In buying, improving, stocking and operating the ranch they ran behind. As a result, John borrowed money from Tom from time to time until he owed him $18,500. To satisfy that indebtedness he transferred his interest in the ranch to Tom. At the same time, Tom bought Reardon's half interest for the same price, paying him $3500 in Liberty Bonds, fourteen diamonds valued at $7500, $1500 in currency and a two-thirds interest in four pieces of St. Joseph real estate (valued at $6000) which he owned with Reardon, the deeds being in Reardon's name or in blank. Thereafter until March 1, 1923, John Kegan and Reardon rented the ranch from Tom, and continued to operate it.

Tom Kegan swore the date of the transaction by which he bought the ranch was December 2, 1921. If that be correct, the three deeds consummating the conveyance were not executed until' five days later —on December 7, 1921. (One of the deeds is dated *November 7, 1921*, evidently by mistake.) The deeds were acknowledged by Reardon on December 29, 1921, and recorded the next day.

On the same day that Reardon deeded the ranch to Tom—December 7—Tom executed, or at least signed, the $28,000 in mortgage notes against the ranch involved in this suit. He insists he signed the notes and the three mortgages securing them, but did not acknowledge the mortgage, and put them all in his box on the day they were dated. The notes had not at that time, he says, been indorsed over by the bank as payee. He did this for no purpose whatever except that, being a busy man of varied interests and without much ready cash, if he should later want to borrow money in business enterprises (no particular venture was then in contemplation) he would use the mortgage notes as collateral to his personal notes at the bank—that Reardon had told him so. As to this latter statement he was corroborated in part by his brother and two other witnesses, who say they heard appellant ask Reardon if he would make a loan on the ranch and Reardon replied he would fix him up in a few days.

The respondent maintains the appellant's statement of how and why he executed the $28,000 in mortgage notes on the ranch is

unworthy of belief, and scoffs the story that he paid for Reardon's part of the ranch in Liberty Bonds, diamonds, cash and a two-thirds equitable interest in four pieces of city real estate. Among other things, it was, shown by respondent that two of these four pieces of real estate had already been sold by Reardon, one nearly two years before and one about nine months. It is respondent's theory that appellant executed the $28,000 in notes with the definite intention and purpose of turning them over to Reardon, partly to pay Reardon for his interest in the ranch, partly to finance Reardon in purchasing an interest in a string of moving picture theaters, and partly to be used as collateral for the indebtedness of appellant's brother John to the Park Bank. From certain evidence, mostly circumstantial, it is argued the appellant did not put these securities in his bank box at all, or that if he did, Reardon took them out with his consent for the above purposes.

Along this line, attention is called to the fact that each of the three mortgages bears a certificate of appellant's acknowledgment before Minnie Ziebold, notary public, dated December 30, 1921, the same date the deeds were recorded. Miss Ziebold was a bookkeeper at the Park Bank. She testified the appellant did acknowledge the instruments before her on the date shown by her certificates—but she admitted she had no independent recollection of the transaction and that she was basing her statement on her custom of never making out a certificate of acknowledgment unless she had in fact taken it.

The mortgages were actually filed in the Recorder's office on January 5, 1922—less than a month after they were executed. On the day before that—January 4, 1922—the whole issue of $28,000 in mortgage notes was presented by Reardon to Wiehl, president of the bank, with the request that they be indorsed over to him by the bank as payee, without recourse, and run through the bank records. This was done. Mr. Wiehl testified the bank then had no interest in the notes and no knowledge of any taint in Reardon's title thereto; and he further explained that many times persons lending money on mortgage security would have the papers written up on the bank forms and in the bank's name, and then the bank would indorse the mortgage notes over to the latter without recourse.

The note register of the bank showed the notes entered in sets, all the notes in each set receiving the same bank number. Opposite each set was a notation: "Note run through by request of James F. Reardon. The bank had no interest in the note. Note assigned without recourse to James F. Reardon." These entries, it was stated by Mr. Stinson, the cashier, in his testimony, were made by him in due course about the time the loans were registered, and there were corresponding entries in the bank's general ledger showing the appellant charged and credited with the amount of the notes, as they

passed momentarily in and out of the bank to Reardon in the order of bookkeeping.

From here on the history of the first mortgage ranch notes and that of the second mortgage ranch notes, in the whole issue of $28,000, diverge. Considering the latter first. Opposite the entry in the bank's note register of the set of second mortgage notes, bank No. 18296, notes Nos. 1 to 5, as shown in the list above, was a notation that Reardon had turned notes Nos. 1, 3, 4 and 5 over to the Park Bank as collateral. These were one note for $2000 and three notes for $3000 each, making $11,000. The cashier testified this entry was made by him "just about the time, possibly, the record was made, because that is the time they were put up as collateral; shortly after that, at any rate."

Another book of the bank for that same period, called the Bills Receivable book, contained an entry dated April 26, 1922, showing this $11,000 in notes held as collateral for a $6849 note signed by the appellant's brother, John Kegan, and Reardon. This note was reduced slightly by credits and renewed the following November, but what became of it afterwards is not clearly shown in evidence. However, the bank cashier, Mr. Stinson, testified that thereafter Reardon put up a string of collateral to the Park Bank aggregating $32,500, which included the $11,000 in second mortgage ranch notes, to secure his own indebtedness and the "Kegan loans," as the list of the collateral recited. The list was introduced in evidence. It was on the back of a written guaranty executed to the bank by Reardon in September, 1922, guaranteeing all credits extended to John Kegan up to $15,000, and was in the handwriting of Mr. Wiehl, president of the bank. Mr. Wiehl testified he made it from the notes themselves—that he had them before him at the time. He couldn't tell when he made it, but it was after March 30, 1923, the date of the freshest note, and before Reardon left the bank. The cashier testified the $11,000 second mortgage notes had remained with the Park Bank ever since the date first mentioned above, April 26, 1922, and that he had seen them there frequently.

The appellant's brother, John Kegan, testified he remembered the circumstance of Reardon's giving this written guaranty and putting up a list of collateral. It was because a correspondent bank objected to Reardon's being so heavily obligated on his joint indebtedness with John, which then amounted $19,000. Reardon proposed that he withdraw from the notes as a signer, leaving John as sole maker, and that he (Reardon) and John and Tom Kegan would all leave their securities up for John's notes, which was done. But John testified that the security he and Tom put up under this arrangement amounted only to $13,500 and did not include the $11,000 second mortgage

ranch notes. The indebtedness for which they were held as collateral by the Park Bank, at the time of the trial below, was $16,699.54, which was made up of Reardon's sole notes for $2070 and John Kegan's for $14,629.54.

Another piece of evidence concerning the $11,000 in second mortgage notes is this. On May 8, 1923, the appellant and John Kegan signed a note to the Park Bank for $6676.74. This note was on a printed collateral note form, and just below the lines for signatures to the note proper was a rather long printed recital, beginning: "We have deposited with the said bank as collateral security for the payment of the above and any other liabilities of the undersigned to the said bank, due or to become due, or which may hereafter be contracted or existing, the following property, viz:" Here was filled in "14 shares Mechanic State Bank Stock $1000 Baby Bonds in process of collection ($32500) general string of collateral amount to $32,500 indorsed by Jas. F. Reardon." This collateral pledge form, as well as the note proper, was signed by the two Kegans, and like the note was dated May 8, 1923.

On July 9, 1923, T. J. Kegan paid $1400 on the note, and took a receipt from Reardon as follows: "July 9, 1923. Recvd. of T. J. Kegan $1400 applied as a credit on the note of T. J. Kegan and Jno. P. Kegan of $6676.64 note No. 43031 leaving a balance due of $63.87 to be paid by T. J. Kegan which is the amount due from him as part of said note, when said $63.87 is paid by T. J. Kegan releases him from said note. (signed) Jas. F. Reardon." At the time, Reardon returned to Kegan the fourteen shares of Mechanics State Bank Stock mentioned in the note as a part of the collateral and they interlined in the note these words: "This stock delivered to," following which the appellant signed his name, "T. J. Kegan."

The appellant and John Kegan testified they signed the note because they trusted Reardon; that they didn't read it carefully and did not notice the reference therein to the string of collateral amounting to $32,500, and didn't know the $11,000 second mortgage notes were a part thereof. John admitted, however, that the $32,500 string of collateral mentioned in this note was the same collateral that was already up with the bank securing other notes, as recited a few paragraphs back. The appellant testified it was his understanding that when he paid the $1400 and the small balance of $63.87 mentioned in Reardon's receipt (which he claims he later did do) he was to be released from all liability under the note.

The respondent admits that according to Reardon's receipt these payments would and did release appellant as a direct obligor on the note, but asserts he was not thereby released as pledgor of the collateral called for by the note, the balance of the note still being unpaid by the other signer, John Kegan, as it continued to be down

to the time of the trial below. But chiefly, respondent insists that the execution of this $6676.74 note by the appellant, and his interlining his signature in the very part of it enumerating the collateral, prove he knew the $32,500 collateral was up with the bank, and that it included his $11,000 in second mortgage ranch notes.

The second mortgage notes referred to in the preceding paragraphs, it will be remembered, were notes Nos. 1, 3, 4 and 5. This left out note No. 2 of that set, for $3000. As to this note the Bills Receivable record of the bank contained an entry showing that it was put up by Reardon as collateral to secure his own note for $2200 dated January 19, 1922, which was just a few days after the whole issue of notes had been run through the bank. The Reardon $2200 note was renewed and reduced by credits until a renewal note for $1270, bank No. 42496, was given on March 13, 1923. The note register of the bank, opposite the entry of note No. 2, bore the notation in the handwriting of Mr. Wiehl, the president: "This is pledged to Park Bank as collateral on No. 42496 Jas F Reardon $1270 but Reardon has the # 2 note and will substitute security."

During the following month, April, 1923, without right or authority or the knowledge of the other bank officers, Reardon sold the $3000 No. 2 note to a man named Holkenbrink, or at least placed it with his papers in the bank and charged his account with the amount of it. About a week after Reardon was discharged, Holkenbrink learned this $3000 note had been transferred to him. So, on August 24, 1923, he went to the bank with his attorney for a conference. The bank was represented by its attorney, Mr. Groves, the cashier Mr. Stinson, and one of the directors, Mr. James E. Cox. In this conference, which continued for three hours until seven P. M., Holkenbrink contended the $3000 note was his because Reardon had only been authorized to submit a first mortgage for investment, and instead of doing that, had put a second mortgage note with his papers and charged his account with it. The bank officers called the appellant, Tom Kegan, and his brother John, to the bank, and Reardon, also, but they stayed out in the business room and did not go into the directors' room where Holkenbrink and his party were.

The testimony of Messrs. Groves, Stinson and Cox is that they explained the situation to the appellant and told him if he consented the bank would take back the note from Holkenbrink, pay him therefor, and carry it as a bank asset. They further informed him that in so doing the bank would only be entitled to interest on the note from the date it took it, so it was suggested that Reardon and the appellant credit the interest on the note up to that date. This Reardon and Kegan did, and the note as offered in evidence so shows. These three witnesses say Kegan consented to the arrangement, and that the bank then and there took back the note, had Holkenbrink in-

dorse it over without recourse, and paid him $3000 for it. They further testified that while the matter was under discussion the appellant mentioned the fact that the bank was also holding the remaining $11,000 of second mortgage notes in the same series, and asked how about the interest on them. The bank officers say they replied there need be no interest rebate on the $11,000 notes, since they were up only as collateral and the bank was looking to the principal notes which they secured for interest. These three witnesses swore, in addition to the foregoing, that the appellant and his brother made no complaint that the $11,000 in notes and the $3000 note had been wrongfully taken from his box.

In his testimony, the appellant complained bitterly about this transaction and said he was duped into joining with Reardon in signing the interest credit on the $3000 No. 2 note. He declared Stinson and Cox told him that by so doing he could save $100 interest, and that Stinson promised he would give him back his collateral. He contradicted the bank officers, and said he told them they could not hold the note against him because he had never derived one penny from it, but explained he was finally overpersuaded and did sign. He insisted further, that nothing at all was said about the remaining $11,000 of the mortgage notes, and all his testimony is corroborated by that of his brother John.

So much for the $14,000 in second mortgage notes against the hog ranch, and referring now to the $14,000 in first mortgage notes. The records of the Park Bank show nothing about these notes except that they were run through the books and indorsed to Reardon, as heretofore stated. After Reardon's exposure, however, it developed that he had pledged all of them to the First National Bank of St. Joseph as collateral to secure his own note for $15,000, dated January 17, 1922. This, it will be recalled, was just twelve days after the mortgages securing the notes were recorded on January 5, 1922, and a few days over a month after they were executed on December 7, 1921.

It is the respondent's contention that this $14,000 in first mortgage notes was used by Reardon in financing the purchase of an interest in some moving picture theaters, with appellant's consent. Reardon bought a half interest in the theaters in December, 1921, paying $6,000 on December 19 and $12,500 more on January 17, 1922. The date just mentioned, on which the $12,500 was paid, is the same date on which Reardon pledged the $14,000 first mortgage notes to the First National Bank to secure the increase of a $7500 loan he already had to $15,000.

A year and a half later, in August, 1923, after Reardon's exposure the appellant with a man named Duncan went to the managers of the picture show business and exhibited an assignment from

Reardon dated February 5, 1922. The appellant talked about the condition of the business and said he was a partner, and that the reason he had not made the fact known before was because Reardon had told him to keep quiet about it. Also, about the same time, the appellant had a talk with Mr. Stinson, cashier of the Park Bank. Being informed by Stinson that the Park Bank had an assignment from Reardon of his interest in the picture show enterprise, dated in May, 1923, the appellant informed Stinson that he had an assignment of earlier date, and said, "Our money went into the picture show business." At Stinson's request appellant showed him the assignment, which, Mr. Stinson testified from memory, was dated February 25, 1922. It was further shown by respondent that a short time after the incidents just mentioned, the appellant went to Omaha to look into the financial condition of the picture show business, which was in jeopardy, because of the threatened foreclosure of a mortgage.

The appellant explained all this evidence by saying Reardon did not actually make the assignment of the theater business to him until after leaving the bank, and that in writing it Reardon dated it back—not to February, 1922, as the respondent's witnesses testified, but to sometime early in 1923. He said he accepted the assignment from Reardon conditionally to cover his losses at the bank caused by Reardon, and with the understanding that he would not keep it unless he found the theatrical enterprise in sound condition. In the meantime the assignment was to be held by the man named Duncan. His interview with the picture show manager and his trip to Omaha were simply to investigate, and as this investigation demonstrated the enterprise was hopelessly in debt, he had Duncan give the assignment back to Reardon. Duncan corroborated him in this. The appellant admitted, however, that in talking to Stinson, the bank cashier, he let Stinson get the impression his own assignment was ahead of the bank's, when such was not the fact.

There was also this evidence for respondent regarding the $14,000 first mortgage ranch notes. Shortly after the exposure of Reardon's wrongdoing, in August, 1923, the appellant called at the First National Bank in St. Joseph and inquired of Mr. Ford, the president, as to whether any of his notes were held by that bank as collateral to Reardon's obligations. Mr. Ford showed Kegan the $14,000 first mortgage notes and Kegan acknowledged his signature thereon. The appellant called at this bank two or three times and on none of these occasions did he make any claim that the notes had wrongfully been taken out of his box at the Park Bank. On one of these visits Mr. Ford told the appellant certain requirements about his notes would have to be met. One of these was that the notes bore interest from date, payable annually, and as they were dated December 7, 1921,

the first year's interest was past due, and that it should be paid, or if it had already been paid to Reardon, the fact should be shown and the interest credited on the notes. Mr. Ford testified the appellant told him the interest had been paid and that he would bring a receipt so showing.

The appellant's version of the incident is, that when he talked to Mr. Ford the first time he informed Ford the notes had been wrongfully taken from his box at the Park Bank. He testified further the question as to the interest on the notes did not come up until a month later when the First National Bank had started foreclosure proceedings under the ranch mortgage. The appellant went to see Reardon about it, and Reardon went with him to the First National Bank to talk about the threatened foreclosure. He also took his attorney along. On the way to the bank Reardon told appellant he was going to tell Mr. Ford the interest had been paid, and when they got there Reardon did tell him that. Then Mr. Ford asked for the receipts and Reardon said, "I am satisfied Tom, you have got one." Then Mr. Ford said, "Well then, the proper thing to do is to bring the receipts up and pin them to the notes." To this the appellant says he answered, "I said if I could find the receipts I would do it." He then went on to say that later that day Reardon made out a fake receipt showing he (Kegan) had paid his interest on the notes, but that being ignorant of the law he sought advice and did not use the receipt or give it to the First National Bank. The testimony just quoted is from the appellant's deposition, and was introduced in evidence.

Going on down the line of securities alleged to have been converted, we come next to the R. G. Lewis mortgage note for $6500 in which the appellant claims a $6000 interest. The remaining $500 interest belonged to Reardon or the bank. The appellant testified he acquired the note from Reardon and put it in his box on March 30 or 31, 1923. He was corroborated in this by the witness named Duncan, who said he was present at the time. The note was offered in evidence. It was dated March 30, 1923, was payable to the Park Bank, and was indorsed to Jas. F. Reardon without recourse, by the Park Bank "by ———." The note was not indorsed to Kegan.

Mr. Stinson, the bank's cashier, testified the note was run through the bank and assigned to Reardon, but that the bank had no interest in it. He said Reardon put up the note as collateral to the bank, and it is shown listed in the string of $32,500 collateral given by Reardon, referred to earlier in the opinion. The Park Bank had custody of the note at the time of the circuit court trial, and makes the same claims with respect to it as are made concerning the $11,000 second mortgage ranch notes. There is nothing in the record showing the date on which the note came into the bank's hands as col-

lateral, except that according to the testimony of the bank officers, it must have been shortly following its date, for only four and a half months thereafter Reardon was exposed.

The next security is the $1000 J. F. Reardon note. The appellant testified this note was dated sometime in January, 1919, and represented money loaned by him to Reardon personally. It was, he said, secured by three shares of Reardon's stock in the Park Bank. Both the note and the stock were put by the appellant in his bank box the day he received them. He testified at the trial he never saw them after that day, although he says Reardon kept the interest on the note pretty well paid up. It would thus appear from the appellant's testimony that he never got the note out of his box, or looked for it, to credit the interest payments thereon. The bank officers who were witnesses for respondent declared they never heard of this note and knew nothing about it.

As to the $250 in Baby Bonds, if the appellant told when or from whom he got them, the testimony has escaped us. He swore he had them in the box. The bank officers on the stand disclaimed any knowledge of them.

The respondent bank did not dispute that the appellant had $200 in Liberty Bonds on special deposit for safe-keeping in its bank vault. As evidence of the fact, the appellant produced a bank receipt acknowledging the deposit of a bond or bonds for $150 by appellant and one bond for $50 by John Kegan, in December, 1917, and appellant said John turned this receipt over to him on the dissolution of their partnership in the saloon business in 1919. The bank contended the bonds were turned back to John Kegan, as shown by a receipt bearing his signature, which was exhibited to the appellant while on the witness stand. The appellant admitted John had authority to take over the bonds, but denied the two receipts referred to the same bonds, as did John also. It seems the numbers of the bonds were not given in either receipt.

Turning now to the last securities on the list, the Nelson note for $5000, the Moore note for $2000 and the Swope note for $805, which the appellant alleged were converted after he had pledged them as collateral for his brother's indebtedness to the bank. He testified that he kept these three notes in his box at the bank, and in March, 1921, got them out and turned them over to the bank as security for his brother's obligations. His testimony was not specific as to the amount of the indebtedness secured. Being asked by his counsel how much the brother owed, he replied he did not know, that his brother was undoubtedly borrowing at that time. Then his attorney asked him the question,

"Put up for anything he should borrow?" and he replied, "Up to that amount, yes." We understand John Kegan's testimony to mean that these three notes were put up to secure his part of the $19,000 indebtedness which he and Reardon then owed the bank, as hereinbefore recited.

The Nelson note was dated October 1, 1920. It was not produced at the trial below. The records of the Park Bank showed it was put up as collateral, securing a $2500 note to the bank signed by John Kegan and Reardon dated April 15, 1920, given in their hog ranch business. This $2500 principal note was never paid and was carried on down by renewals into the John Kegan notes secured by the $32,500 string of collateral heretofore mentioned. But the $5000 Nelson collateral note disappeared from the bank vaults, Stinson, the cashier said, and the investigation made at the time of Reardon's exposure disclosed it had been pledged by Reardon to the First National Bank of St. Joseph on November 25, 1921, to secure his own note for $7500. With it were also put up as collateral his eleven shares of stock in the Park Bank.

The Moore note for $2000 was dated July 1, 1919, due in one year, and bore six per cent semi-annual interest. It was not introduced in evidence. The records of the bank failed to show that it ever was held as collateral. There was, however, a cancelled cashier's check of the Park Bank in favor of John P. Kegan for $60, dated January —, 1920, marked "C. L. Moore, 6 month's interest" and there were two deposit slips marked "Moore Int.," one dated July 10, 1920, for credit of Kegan Bros., and one dated January 24, 1921, for credit of John Kegan. There was also a deposit slip marked "Moore" for $2000 dated March 31, 1921, for credit of R. & K. hog ranch. The corresponding ledger accounts bore credits in the same amounts on the same dates, in each instance marked "Moore." The appellant said he looked up the Recorder's records and found the mortgage released. Both Tom and John Kegan denied they had any knowledge of the application of the proceeds of the Moore note to the R. & K. ranch account at the time it was done, or afterwards until the general investigation was had.

The cashier, Mr. Stinson, further testified he had found no bank record showing the Swope note for $805 had ever been held by the bank as collateral. Mr. Stinson identified, however, a check for $950 to Swope from a building and loan association in St. Joseph, dated September 8, 1921, and indorsed in blank by Swope. The check was given for a real estate loan negotiated by Swope, Mr. Stinson said, and was paid by the Park Bank on September 29, 1921. On September 27, 1921, the farm account of John Kegan at the bank showed a deposit of $950. The respondent contended this showed the proceeds from the payment of the note went to John

Kegan. The note, itself, was introduced in evidence and was stamped paid, but the date was illegible. The note bore the undated indorsement of the Park Bank by Reardon, to *John* Kegan. There was no general or special indorsement of the note by John Kegan or by Tom Kegan, the appellant. On cross-examination of Mr. Stinson, counsel for appellant elicited the admission that the amount of interest on the Swope note in September, 1921, would not make the whole amount due $950, as the principal was only $805 and the interest had been previously paid in full to June 1, 1920. Mr. Stinson said something else must have been taken into consideration, and the matter was left that way.

Respondent contends these facts are significant. The appellant says the Reardon $1000 note was put in his box in 1919. It was supposed to be there when he put the $28,000 mortgage ranch notes in the box in December, 1921, but appellant did not at that time notice whether it was missing or not. The evidence is that of this $28,000 in mortgage notes the $14,000 first mortgage notes must have been taken out of the box on or before January 17, 1922, because they were pledged to the First National Bank by Reardon on that day. Of the $14,000 second mortgage notes the $3000 note No. 2 was pledged by Reardon to the Park Bank on January 19, 1922, and the remaining $11,000 on April 26, 1922. So the entire $28,000 in mortgage ranch notes were gone from the box when the appellant put the $6500 Lewis note in the box on March 30, 1923; and yet he did not miss any of the stolen securities. Appellant argues it is improbable he would not have missed them, and further improbable that he would have executed the $28,000 in mortgage notes in December, 1921, and then failed to have any use for them and never discovered their absence for a year and eight months until about the time of Reardon's collapse in August, 1923.

To sum up what became of the $43,255 securities sued for by appellant, as shown by the evidence: the $14,000 first mortgage ranch notes and the $5000 Nelson note were held by the First National Bank as collateral. Second mortgage notes amounting to $11,000 and the $6500 Lewis note were held by the respondent Park Bank as collateral. The $3000 second mortgage note No. 2 was held by the respondent bank as owner by purchase from Holkenbrink. The Reardon $1000 note and the $250 Baby Bonds were never discovered at all. The $200 in Liberty Bonds were either turned over by the respondent bank to the appellant's brother John Kegan, or they, also, were lost. The $2000 Moore note and the $805 Swope note were paid off and the proceeds credited to bank accounts in which the appellant's brother John Kegan was interested.

This case is really several cases in one, with separate sets of facts and questions of law. It will be impossible to notice specifically all of the many questions raised.

I. We have felt it necessary to review at some length the evidence concerning the $28,000 in mortgage ranch notes, because of the appellant's criticism of respondent's Instruction 3. In this instruction the jury were told if the appellant delivered these notes to Reardon as the property of Reardon, or to be sold by Reardon, or to be used by Reardon as collateral security in borrowing money, then there was no conversion of the notes and the verdict should be for defendant with respect thereto. Appellant urges there was not an iota of evidence to support the instruction, unless it was the bank records and that these were hearsay and self-serving.

Considering the relations between the appellant and Reardon, the manner of executing the ranch notes, the use made of them by Reardon, the failure of appellant to discover or complain of that use for so long, his statements to Mr. Ford of the First National Bank and to Mr. Stinson of respondent bank, and other evidence in the record, we think the issue was properly submitted to the jury.

Regarding the admission of the bank records. In harmony with his theory appellant asked and the court refused an instruction numbered II, which said appellant was in no manner bound by the entries in the bank records unless he made them himself or authorized them. This instruction was in keeping with the objection made by appellant at the trial, which was:

"Mr. Randolph: Just a minute—The objection I am making is this, that there is no record that this bank or any other person could make that would be in any manner binding upon this plaintiff unless he himself participated in the making of the record, and this has not any tendency to show that these notes were not taken out of his box."

That a bank's books in the nature of books of account are admissible in its own favor when properly authenticated as to the time and manner of making the entries, is too well settled to admit of discussion. [Anchor Milling Co. v. Walsh, 108 Mo. 277, 18 S. W. 904, 32 Am. St. Rep. 600; Robinson v. Smith, 111 Mo. 205, 20 S. W. 29, 33 Am. St. Rep. 510; Lyons v. Corder, 253 Mo. 539, 548, 162 S. W. 606.] And while it has been said the general rule is such books are competent only to show entries between the parties to the suit, yet the courts of this and other states have by no means always set that limit. [Lyons v. Corder, 253 Mo. l. c. 548; State v. Wagner, 311 Mo. 391, 408-9, 279 S. W. 23, 27; Ritchie v. Kinney, 46 Mo. 298; 22 C. J. 880; State Bank of Pike v. Brown, 165 N. Y. 216. 59 N. E. 1, 53 L. R. A. 513, 521, 528, note.] Appellant cites C. G. &

S. L. Ry. Co. v. Kimmel, 58 Mo. 83, 85. In that case a recital in the *minutes* of the board of directors of a corporation was relied on as showing an *acknowledgment* of the claim by defendant in an action on an account *stated*. It was held hearsay and incompetent. The case is clearly distinguishable for several reasons. We think the bank records were admissible in this case in respondent's behalf to show what was done with the securities involved (Miller v. Peoples Savings Bank (Mo. App.), 204 S. W. 37), and in connection with other evidence tending to show Reardon's authority. [22 C. J. sec. 1066, p. 880.] It has been held, also, that bank deposit slips are competent in connection with the bank records. [Citizens State Bank of Atlanta v. Ferson (Mo. App.), 208 S. W. 136, 139.] As to memoranda on the records, of course it goes without saying, they must be authenticated as a part of the records to be admissible as such.

II. Respondent's Instruction No. 4 stated "that if a bank receives the property of a person to be kept by it for the accommodation of such person, without any pay, such bank is not responsible to such person if said property is stolen by an assistant cashier of said bank, unless at the time of such theft some officer or agent of the bank knew or had reasonable cause to suspect that such assistant cashier was dishonest or not trustworthy." By respondent's Instruction No. 9 the same rule was applied specifically to the Reardon $1000 note, and by its Instruction No. 10 to the $250 United States Baby Bonds. Appellant requested and the court refused to give instructions numbered B, C, E and F, which put the contrary theory that if the appellant had been a customer and depositor at the bank for many years and the use of the bank vault was extended to him for the safe-keeping of his box containing his securities, in connection with other services rendered him, then the bank was not a gratuitous bailee, but was bound to use the highest degree of care, and if the papers were taken from his box by any officer of the bank without his consent, the verdict should be for plaintiff.

In our opinion the issue submitted by respondent's three instructions was not within the pleadings. In effect they told the jury if the bank negligently harbored the dishonest assistant cashier, the appellant could recover. If the appellant's action had been for negligence that would be true, but it was not; it was for conversion, and mere negligence or non-feasance rarely will support a suit for conversion. [26 R. C. L. sec. 22, p. 1112; 3 R. C. L. sec. 39, p. 117; 38 Cyc. p. 2017; 24 A. S. R. note, p. 808.] The action being in trover, and the fact being assumed that the assistant cashier did convert the securities it would seem the only question to be determined would be

whether the act of the assistant cashier was the act of the bank. However, closely related questions are raised by appellant's refused instructions, so we shall pass on the issue.

The respondent's instructions seem in accord with the weight of authority as gathered from the great number of cases cited in 1 Am. Neg. Rep. pp. 477-608; 4 A. L. R. note, pp. 1196, 1216, 1221; 17 A. L. R. 703; 40 A. L. R. note, p. 899; 48 A. L. R. note, pp. 378, 393. They are in harmony, as well, with the statement of the law appearing in 3 Ruling Case Law, section 189, page 562, where it is said:

"As a general rule a bank is not liable for the loss of a special deposit, for keeping which it receives no compensation, by the theft of its cashier or other servant, provided it has not been guilty of negligence in any respect. The bank, however, may be guilty of negligence, and liable accordingly, in employing or retaining an unfit person in its employ. But when it does its full duty in selecting a proper person, and in not disregarding indications of dishonesty which ought to arouse suspicion and investigation, then it is not responsible to one who has obtained from it the favor of barely keeping specific property without recompense, though the cashier steals the property so put in his charge." .

But we are not convinced the rule thus announced should apply indiscriminately and without qualification to all the securities taken by Reardon. (We leave out of account altogether securities now in the bank's possession, respecting which it defends on other grounds.) Most of the securities admittedly converted (*arguendo*) were in the box. The Liberty Bonds were in custody of the bank *in specie*. The bank contends they were turned over to appellant's brother, Tom Kegan, but if they were not, they were either lost or taken by Reardon, so we include them in our consideration.

The degree of care owing from a gratuitous bailee has been the subject of much discussion for more than a century, as some of the cases say, and yet probably no other legal principle remains in a state of greater obscurity and confusion. It was formerly the rule that (1) a gratuitous bailee—a bailee acting for the sole benefit of the bailor—was liable only for gross negligence and under no duty to exercise care except such as he bestowed on his own similar property, even though the most inattentive of persons; (2) that in case of a bailment for the mutual benefit of bailee and bailor, or a bailment for hire, the bailee owed the duty of ordinary care, and (3) that a bailee for the sole benefit of himself owed the highest degree of care. But it has been argued—with reason—that even a gratuitous bailee owes the duty of good faith and that this duty imposes on him an obligation to use *reasonable care in the circumstances*, though he may not exercise like vigilance with respect

to his own property. Especially is this true when the bailee possesses special skill or facilities for the care of the bailment. [Eddy v. Livingston, 35 Mo. 487, 493, 88 Am. Dec. 122, 1 Am. Neg. Cas. 799.] The refinements of reasoning have progressed so far that it is said in one case in this State that there is no difference between the degree of care due from a gratuitous bailee and that due from a bailee for hire. [Levi & Co. v. M., K. & T. Ry. Co., 157 Mo. App. 536, 543, 138 S. W. 699.]

While it seems impossible to state a concise formula that will cover all cases, yet it appears contrary to principles of natural justice to hold a bailee who acts solely for the accommodation of the bailor under the same obligation and duty as if he were paid for the service. In attempting to measure that duty as applied to the facts of this case, without further defining it, we think there is some ground for distinction between the amount of care owed by the bank with respect to securities in the appellant's box and that to be exercised with regard to the Liberty Bonds which were not in the box. The box was left at the bank for safe-keeping, locked. The bank was not expected, indeed, had no right, to open the box and keep track of specific securities therein. It was, let us concede, under the duty to exercise reasonable care to see that the box and contents remained in the bank and that the box was not opened by anyone except the appellant, or his authorized agent; but there, it seems to us, its duty stopped. On the other hand, as to the Liberty Bonds in the bank's care, *in specie,* there was opportunity and a corresponding duty, to check over the specific securities from time to time, regardless of whether employees were under suspicion. The securities might disappear from other causes. If this had been done the disappearance of the Liberty Bonds from *any* cause would have been noted (assuming they did disappear).

Making concrete application of what has just been said, we think the measure of the bank's duty was correctly defined in respondent's instructions, so far as concerned securities in the box. If the bank did not know or have reasonable cause to believe the assistant cashier was untrustworthy, it was not guilty of negligence, since it was under no duty to keep account of the specific securities. As to the Liberty Bonds on special deposit *in specie* we hold the duty of the bank extended somewhat beyond that. It was bound to make some reasonable effort to keep track of the securities in its own custody. The foregoing, we believe, is and should be the law, whether the bank be regarded as a gratuitous bailee duty bound to use reasonable care in the circumstances, or as a bailee for mutual benefit or hire, held to the duty of ordinary care.

Appellant's reply brief argues that Reardon's knowledge of his own wrongdoing was knowledge to the bank because he was its officer and agent. While the general rule is that notice of facts possessed by an officer of a corporation respecting matters of corporate interest is imputed to the corporation, yet this is not so when the officer is acting for himself, personally, unless, at the same time, he is also acting as sole representative of the corporation. (Bartlett v. McCallister, 316 Mo. 129, 289 S. W. 814, 818), and in pilfering papers from the files and vaults of the bank Reardon was not acting for or as representative of the bank.

Turning to appellant's refused instructions on the same subject. Appellant's theory was that since he had done his general banking business at the bank for many years, if the bank kept his box in connection with its other banking services, then it was a bailee for hire. The cases cited on this point are Grenada Bank v. Moore, 131 Miss. 339, 95 So. 449, and Leach v. Hale, 31 Iowa, 69. In our opinion the better reasoned authorities are to the contrary. [3 R. C. L. sec. 187, p. 560; Merchants Natl. Bank v. Guilmartin, 88 Ga. 797, 804, 15 S. E. 831, 17 L. R. A. 322, 1 Am. Neg. Cas. p. 477; Foster v. Essex Bank, 17 Mass. 479, 505, 9 Am. Dec. 168, 1 Am. Neg. Rep. 502; Kubli v. First Natl. Bank, 199 Iowa, 194, 197, 200 N. W. 434.] If the bank had agreed to take charge of the appellant's box *in consideration* of his doing his banking business there, a different situation would be presented, but it does violence to the facts to imply a consideration when none has been shown. Many forms of gratuitous service are rendered by the ordinary bank to its customers, but it can hardly be said because the recipients are customers the services are for hire.

Another fault in appellant's instructions is that they say if the bank was a bailee for hire it was bound to use the *highest* degree of care. That is the rule in case of bailments for the exclusive benefit of the bailee, but as to bailments for hire the requirement is ordinary care. [Levi & Co. v. M., K. & T. Ry. Co., 157 Mo. App. 1. c. 543.]

Still another error in appellant's instructions is found in the statement that if the bank was not a gratuitous bailee and the securities were taken from the box by an officer of the bank without appellant's consent, he is entitled to recover. The thought, as we get it, is that the bank would be liable as principal for the tortious act of the officer as its agent. This is not the law even as to bailees for hire except where the act of the agent is within the real or apparent scope of his authority, or where the

648

principal accepts and retains the benefits of the tortious act. [39 C. J. sec. 1490, p. 1295; Union Biscuit Co. v. Springfield Grocer Co., 143 Mo. App. 300, 308, 126 S. W. 996; Merchants Natl. Bank v. Guilmartin, supra; Foster v. Essex Bank, supra; Ray's Admrs. v. Bank of Kentucky, 73 Ky. 344, 353; Scott v. Chester Co. Natl. Bank, 72 Pa. 471, 478-9, 13 Am. Rep. 711; Sherwood v. Home Savings Bank, 131 Iowa, 528, 537, 109 N. W. 9.]

As already observed the act of Reardon in pilfering securities from the files and vaults of the bank for his own private gain was not and could not have been within his actual or implied powers as assistant cashier. In taking them he was an outlaw, not his master's representative. Furthermore, it was not a part of his duties to handle the securities which were left there only for safe-keeping. Without the slightest question this is true of the securities in the box, and though, perhaps, not so apparent, we think it is also true of the appellant's Liberty Bonds on special deposit. Neither was Reardon's act within the scope of his *apparent* authority. Indeed, the rule binding a principal by acts of an agent within the scope of the latter's apparent authority only applies when a third person deals with the agent to his prejudice in reliance on appearances. In this case Reardon dealt with no one but himself in stealing the securities. The act did not involve the transaction of business with a third party. In this respect the case at bar differs from such cases as Eastin v. Bank of Harrisonville, 213 Mo. App. 130, 246 S. W. 991, and Third Natl. Bank v. St. Charles Savings Bank, 244 Mo. 554, 149 S. W. 495. Finally, the bank did not reap the fruits of Reardon's tort. So we are unable to see how under any view the respondent can be held liable for the larcenies of its assistant cashier under the laws of agency.

It is suggested that on grounds of public policy, and from the standpoint of abstract morals and equity, the bank ought to be held liable under the facts appearing here, even though ignorant of Reardon's wrongdoing, on the theory that where one of the two innocent persons must suffer, the burden should fall on him who made the wrong possible. But there are, it seems to us, even greater and more comprehensive equities to be considered. What about the rights of all the other depositors in the bank? The law throws all possible safeguards around the administration of banking institutions. They are subjected to periodical examination and their transactions are strictly scrutinized by the State. But if banks are to be held bound in cases of gratuitous bailments in locked boxes, even though free from negligence, there is no end of the undisclosed liabilities to which they may be subjected, and of which no bank examiner can have any knowledge. In our opinion no

dictates of public policy call for an extension of the rule beyond what it is under the general law. On the contrary, it seems inequitable to say that one who has left his box at a bank free of charge, merely for safe-keeping and not for any banking purpose, with the keys accessible to the bank employees, should stand on practically the same footing as one who is abused in the transaction of regular banking business.

III. Respondent's instructions numbered 5 and 8 told the jury that if the appellant pledged the $11,000 second mortgage ranch  notes and the Lewis $6500 note in a general string of collateral amounting to $32,500, to secure the $6674.76 note signed by him and his brother John, then he could not recover therefor, even though he had paid off his $1463.87 part of the note.

The appellant's objection to this instruction is, first, that there is no evidence that the appellant did pledge a $32,500 string of collateral to the respondent bank, or that he pledged the two notes mentioned, and the second objection is that the instruction is wrong in saying the collateral is still bound for the principal note notwithstanding the appellant has paid off his part of it. As to the first objection we think there was sufficient evidence to submit the issue of fact to the jury. As to the second objection, it is true the instruction tells the jury as a matter of law that even though appellant paid off his part of the note, nevertheless his collateral is still bound for the payment of the balance of the note due from John Kegan. We think this is correct, and understand that to be the purport and effect of the receipt given by Reardon to appellant when the $1400 was paid. The receipt acknowledged payment of $1400, leaving a balance of $63.87 to be paid by appellant and said "when said $63.87 is paid by T. J. Kegan releases him from said note." The collateral pledge was on the same piece of paper, but below the signatures to the note. It does not seem to us the receipt bears the construction that appellant was not only to be released from further payments on the note, but his collateral was to be released as well. We are confirmed in this construction of the instrument by the whole course of dealing of the parties, and by the fact that when appellant paid the $1400 the only collateral he took down was $1400 of Mechanics State Bank stock. In this connection it should also be remembered the terms of the pledge contract were, the collateral was bound for all other debts of John Kegan, as well.

IV. Respondent's Instruction 6 said that even though Reardon took the Holkenbrink $3000 note No. 2 out of appellant's box without appellant's knowledge or consent, while the box was held by the bank under circumstances claimed by appellant, yet if the respondent bank took over the note as its own property and paid value therefor with appellant's knowledge and consent, then appellant could not recover for that note. On this same issue, the appellant asked an instruction called No. 7, from which the court struck a part reciting that unless the jury found Holkenbrink was the actual owner of the note when the respondent bank took it over on his indorsement, the bank acquired no title thereby and the previous conversion of the note in taking it from appellant's box was not purged since no consideration was paid to appellant.

We think the respondent's instruction was correct and appellant's instruction was wrong. The action of trover is a tort action, and conversion is an *unauthorized* assumption and exercise of the right of ownership over the personal property of another to the exclusion of the owner's rights. [38 Cyc. p. 2005; Allen v. McMonagle, 77 Mo. 478.] Hence, as is said in 38 Cyc. page 2009: "It is a well-settled rule that if the owner expressly or impliedly assents to, or ratifies, the taking, use, or disposition of his property, he cannot recover for a conversion thereof." If, as respondent's instruction puts the facts, the appellant did agree to the bank's taking over the note as *its own property,* such acquiescence necessarily involved ratification of the earlier appropriation of the note by Reardon and his transfer thereof to Holkenbrink, from whom the bank got it—or at least it waived it.

V. Respondent's Instruction 7 told the jury, in substance, that even though the $5000 Nelson note, the $2000 Moore note and the $805 Swope note, which had been put up by appellant as collateral for the indebtedness of his brother John, had been converted as shown in testimony, still, if John's indebtedness remained unpaid, there could be no recovery for the conversion of these notes. It was an admitted fact in the case that John's indebtedness was not paid, and that it amounted to about $14,000, though the instruction does not submit the question as to the amount of the debt. The appellant requested and the court refused two instructions, Nos. A and B, which told the jury that if these notes had been collected or disposed of (as the evidence shows they were) and the proceeds not applied on the principal indebtedness secured (as the evidence shows they were not) then the verdict should be for the

plaintiff as to these notes. The appellant's instructions leave out of account the fact that John's indebtedness is still unpaid.

The appellant's theory is that since these notes had been converted and it was out of the power of respondent to return the collateral, he was under no duty to tender the amount of the principal debt before suing, and that he could sue in trover and recover for the conversion leaving the principal debt unpaid. The great weight of authority supports appellant's position that in the foregoing circumstances he need not make a tender of the principal debt as a condition precedent to suing. [21 R. C. L. sec. 39, p. 677; 31 Cyc. 856; 24 L. R. A. (N. S.) 511, note.] The Missouri cases do not seem to be in accord. McClintock v. Central Bank of K. C., 120 Mo. 127, 133, 24 S. W. 1052, appears to follow the English rule, requiring a tender. Richardson v. Ashby, 132 Mo. 238, 247-9, 33 S. W. 806, and Hagan v. Continental National Bank, 182 Mo. 319, 347, 81 S. W. 171, point the other way. A tender was held necessary in Nevius v. Moore, 221 Mo. 330, 336, 360, 120 S. W. 43; Amick v. Empire Trust Co. (Mo. Div. 1), 296 S. W. 798, 804, and Schaaf Admr. v. Frees, 90 Mo. App. 111, 116; but in these three cases last mentioned the collateral had not passed out of the control of the pledgee. That fact was explicitly noted in the opinions in the Amick and Schaaf cases. The law should not require the pledgor a preliminary which is vain and useless in the circumstances. We hold that when the pledgee has converted the collateral in such manner that it is impossible for him to return it, the pledgor need not tender the debt secured and demand a return of the collateral before suing for the conversion.

But it does not follow that the pledgor is wholly freed of his indirect or limited liability on the debt secured. The obligations of the pledgor and pledgee are reciprocal. It is the duty of the pledgee to return the collateral on payment of the principal debt, but it is equally the duty of the pledgor to satisfy the debt to obtain a return of the collateral. [Nevius v. Moore, 221 Mo. l. c. 360-1.] The law does not treat the conversion of the pledged security as a destruction and annullment of the pledge contract, but regards it simply as a breach thereof. [Schaaf, Admr. v. Frees, 90 Mo. App. l. c. 116.] Hence it is almost universally held that in the pledgor's suit for conversion the pledgee may recoup the amount of the principal debt. [21 R. C. L. sec. 39, p. 677; 31 Cyc. p. 847.]

When the pledgor is directly bound on the principal debt and has put up collateral to secure his own obligation, the debt may be interposed by the pledgee as a counterclaim under the statute. [Sec. 1233, R. S. 1919; Hornsby & Monroe v. Knorpp, 207 Mo. 302, 321, 232 S. W. 776.] But where, as here, the pledgor has put up the collateral merely to secure the debt of someone else, the pledgee can-

not, of course, counterclaim against the pledgor in the suit for conversion—for the principal debt is due from a third party; but he may recoup defensively as at common law for the amount thereof, not exceeding the value of the collateral. By the recoupment, the pledgor's damages are held to the value of his interest in the collateral—that is to say, the value of the collateral minus the amount of the principal debt, if the former exceed the latter. [26 R. C. L. sec. 68, p. 1153; Work v. Bennett, 70 Pa. 484, 488-9.]

But unlike our statutory counterclaim, a common law recoupment is purely defensive, and no affirmative judgment can be rendered thereon. [24 R. C. L. sec. 3, p. 793, sec. 5, p. 795; 34 Cyc. p. 643; Emery v. St. L. K. & N. Ry. Co., 77 Mo. 339, 345.] The effect thereof is merely to abate or diminish the plaintiff's damages, not to destroy his cause of action. It therefore follows that even where the principal debt equals or exceeds the value of the converted collateral the plaintiff is still entitled to nominal damages. [38 Cyc. p. 2088; Cole v. Dalziel, 13 Ill. App. 23, 27.] For this reason we think this Instruction 7 given for respondent was erroneous in saying that in the circumstances stated the respondent was "not liable to the plaintiff in any amount" on account of the converted collateral.

Granting that the respondent's general denial was a sufficient plea of a defensive recoupment, which seems to be the more logical rule—though there is authority both ways, 24 R. C. L. sec. 81, p. 874, sec. 82, p. 875; 31 Cyc. 221, 697-8; 34 Cyc. 643; 19 Ency. Pl. & Pr. 744,—there is another objection to the instruction. By the weight of authority a defendant who has satisfied a part of his demand by way of recoupment, cannot subsequently institute a second action for the balance. In other words, he cannot split his defensive claim. If he uses it to recoup he must use it all and lose the overplus, if any (18 Ency. Pl. & Pr. 737; 34 Cyc. 760; 24 R. C. L. sec. 90, p. 881, sec. 93, p. 885; State v. Ark. Brick & Mfg. Co., 98 Ark. 125, 135 S. W. 843, 33 L. R. A. (N. S.) 376; Penny v. Carey, 147 Ala. 617, 41 So. 978); though this rule does not apply where the defensive claim is severable or divisible. [Brown v. First National Bank of Newton, 132 Fed. 450; 24 R. C. L. sec. 90, p. 881.] The indebtedness of John Kegan in this case is divisible. It is made up of several different notes; but respondent has not treated it as a divisible claim, and in the instruction and briefs refers to it as a whole; and yet, in its instructions numbered 5 and 8 respondent hypothecates its right to hold the $11,000 second mortgage notes and the $6500 Lewis note on the basis that these are collateral for a part of the same debt. We do not understand it to be the law that the John Kegan indebtedness of $14,000 can be thus split up simply by crediting the value of the Nelson, Moore and Swope notes on the whole debt and holding the rest as a principal indebtedness supporting respondent's

claim to the $11,000 second mortgage notes and the $6500 Lewis note as collateral. It would seem specific notes should be brought in for recoupment, so that it may be definitely known which of John Kegan's obligations are settled by the recoupment.

VI. Finally, we come to respondent's Instruction 2, which is as follows:

"You are instructed that the burden is upon the plaintiff to establish by a preponderance of all the evidence to the reasonable satisfaction of the jury that the property described in the petition or some part thereof was placed by the plaintiff in a box, left by him for safe-keeping with the defendant bank and that said property or a part thereof was thereafter taken therefrom by said bank and wrongfully appropriated to its own use, and if you believe that the plaintiff has failed to so establish said facts or if you believe that the weight of the evidence as to such facts is in favor of the defendant, or even if you believe that the evidence as to said facts is equally balanced between the plaintiff and the defendant, then in either of such events the plaintiff has failed to make his case and you must find for the defendant."

This instruction authorizes a verdict, wholly ignoring that part of the appellant's claim which was founded on an alleged conversion of property not claimed to be in the box, namely, the $200 in Liberty Bonds and the Nelson, Moore and Swope notes aggregating $7805. This was prejudicial error. Under the facts of this case the instruction is probably subject to further criticism for telling the jury the property must have been appropriated by the bank to *its own use*. If the appellant's possessive and proprietary rights were invaded by respondent, it would make no difference whether the tortious act was in its own behalf or for someone else. [Bigelow on Law of Torts (7 Ed.) sec. 529, p. 261.] The evidence indicates Reardon took a large part of the property from the box for *his own use* and the only question is whether the bank is responsible for that act, if it was done without appellant's consent.

As to the burden of proof, the instruction is unquestionably right in placing the burden of proof on appellant. [Mason v. Geist (Mo. App.), 263 S. W. 236.] As regards respondent's recoupment, it would seem, on principle, that the burden ought not to be shifted to respondent, for it was purely defensive and shown under a general denial.

For the errors noted in respondent's instructions Nos. 2, 4 and 7, the cause is reversed and remanded. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.

## On Motion for Rehearing.

Ellison, C.—The opinion condemns respondent's instructions numbered 2, 4 and 7. Respondent suggests that none of these errors justify the remanding of the whole case, and that if appellant be given judgment for the value of the $200 Liberty Bonds, for nominal damages and costs he will have the benefit of all these errors. Without reviewing what is said in the opinion about these instructions, we think, on a review of the matter, that this is true; and that such a course would best serve the ends of justice, especially in a long, complicated case of this character. [Third Nat. Bank v. Owen, 101 Mo. 558, 585, 14 S. W. 632; State ex rel. v. Dickson, 213 Mo. 66, 90, 111 S. W. 817; Hecker v. Bleish, 319 Mo. 149, 3 S. W. (2d) 1008.]

However, we should mention two of the instructions. Respondent's Instruction No. 7 was criticized because it brought in for defensive recoupment against appellant (to offset the conversion of the Nelson, Moore and Swope notes aggregating $7805) the *whole* of the John Kegan indebtedness amounting to $14,629.54, whereas, by its instructions numbered 5 and 8, respondent still held on to the $6676.74 note constituting a part of that indebtedness and claimed certain of the securities involved as collateral therefor. We held the Kegan indebtedness was divisible, made up as it was of a number of different notes, but that respondent had not so treated it. On further consideration we have concluded the very fact that these two instructions numbered 5 and 8 set up a separate claim to the $6676.74 note of itself operated as a severance of that part of the whole indebtedness, leaving only the remainder for recoupment against the Nelson, Moore and Swope notes.

As to respondent's Instruction No. 2. The disposition of the case suggested above will obviate our criticism that it ignored the securities not in the strong box, viz., the $200 in Liberty Bonds and the Nelson, Moore and Swope notes; for it will give appellant full credit for the value of these. Regarding the other objection, that the instruction required the jury to find the respondent converted the securities involved to *its own use*. While this language was inartificial, under the facts of this case, we are convinced the jury could not have been misled thereby. The appellant used the same expression in his petition. There was no determinative issue as to whether the bank got the *benefit* of the converted securities. The jury were fully instructed as to the elements of a conversion and the respondent's other instructions took up the several lines of securities separately and stated the theory on which it based its defense as to each of them. In no instance was it even intimated that unless the bank got the benefit or proceeds from the stolen securities it would not be liable. A conversion of the securities to its own use, as that

expression was used in the instruction, meant simply a conversion. Our thought in making this criticism of the instruction in the original opinion was that it might be recast on a new trial, but we cannot go so far as to hold the cause should be remanded for another trial on that account alone.

Accordingly, the motion for a rehearing is overruled, the opinion modified, and the cause reversed and remanded with directions to enter judgment for plaintiff for $210.65 as of October 3, 1924, the date of the original judgment, and for costs. *Lindsay* and *Seddon*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.